No. 99-172

N THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 156

300 Mont. 155

4 P. 3d 643

IN RE MARRIAGE OF GOCHANOUR,

BARBARA GOCHANOUR,

Petitioner and Respondent,

v.

VIRGIL GOCHANOUR,

Respondent and Appellant.

APPEAL FROM: District Court of the Third Judicial District,

In and for the County of Deer Lodge,

The Honorable Ted L. Mizner, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Joseph C. Connors, Connors Law Firm, Anaconda, Montana

For Respondent:

Robert G. McCarthy, Butte, Montana

Submitted on Briefs: August 12, 1999

Decided: June 15, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Virgil Gochanour (Virgil) appeals a Final Decree issued by the Third Judicial District Court, Deer Lodge County, which dissolved his and Barbara Gochanour's (Barbara) marriage and divided their marital estate. We affirm and remand for further proceedings.

¶2 On appeal, Virgil raises the following two issues, the second of which is divided into seven separate sub-issues:

1. Did the District Court err in concluding that no evidence was presented which supported the execution of an antenuptial agreement?

2. Did the District Court err in the dividing of the property of the parties, thus requiring remand?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 The parties were married on June 3, 1989, after living together for five years. They separated on January 18, 1996. Barbara filed a petition for dissolution of marriage on March 27, 1996. Following an April 22, 1998 hearing, the District Court issued its Findings of Fact, Conclusions of Law, and Final Decree on November 4, 1998. Virgil filed a motion to alter or amend the court's findings on December 18, 1998, followed by a brief in support on January 13, 1999, which was deemed denied following the passage of 60 days. Virgil filed his notice of appeal on March 18, 1999.

¶4 In addition to the assets Virgil and Barbara brought into the marriage, both parties substantially contributed to the marital estate during the course of their six-year marriage. Further, what is characterized as a "partnership" in operating their small cattle operation

commenced prior to their marriage. During the marriage the couple purchased property referred to here as the "Cable Road" and "Highway 48" properties. Ranch equipment was purchased as well, as the cattle operation grew from two head of cattle in the beginning of their partnership to approximately 62 at the time of separation. A ranch account, in Virgil's name, grew steadily and showed a balance of $97,191.78 at the time of the 1998 hearing.

¶5 Barbara is a licensed practical nurse, employed at the Montana State Hospital where she has worked since 1979. She earned slightly more than $20,000 a year during the marriage, and accumulated a Public Employee's Retirement System (PERS) account of approximately $33,000. In addition to contributing her income, Barbara testified she worked on the couple's ranch operation, performing such labor as swathing, fixing fences, and helping with calving--which she often accomplished in the evenings after returning from working at the hospital. She also testified that she performed the majority of the household labor.

¶6 Virgil has been disabled since 1986, following an accident in which he injured his back, and receives monthly Social Security compensation of $1,044 each month. In 1997, he earned $12,888 from Social Security and $3,304 in interest income from a bank account. He also received a lump-sum Workers' Compensation settlement after his accident, which was used as collateral to finance the purchase of the cattle operation. In addition to his Social Security income, Virgil also worked the ranching-cattle operation properties referred to here as "Cable Road" and "Highway 48," although he adamantly characterizes such work as a "hobby" which produces no income. He will receive a monthly retirement when he turns 65 of approximately $283.

¶7 At the April 22, 1998 hearing, Barbara and Virgil agreed on very little as to how the marital assets and liabilities should be distributed. Thus, the District Court reached numerous discretionary rulings, most of which are now at issue.

¶8 One key issue decided in Barbara's favor involved the enforceability of a prenuptial agreement. Virgil alleged that two days prior to their marriage he and Barbara executed a prenuptial agreement, at his insistence. He would testify that he recalled both he and Barbara signing the agreement, which was dated June 1, 1989, at his attorney's office, and recalled paying his attorney for this particular legal service. At the hearing, it was undisputed that the original agreement could not be found. Barbara would testify that she was never presented with an agreement and never signed one. The court concluded that the unexecuted premarital agreement entered into evidence was unenforceable, and that

"[n]o evidence was introduced indicating that the Agreement was executed."

¶9 Another critical factor in this dispute is the cancer treatment Barbara underwent during the marriage. Although her insurance paid for most of the treatment, Barbara testified that the out-of-pocket expenses depleted her savings account. She also testified that Virgil paid $2,000 toward her bills and helped pay travel expenses for treatment in Seattle on one occasion. She further testified that $7,000 in medical expenses remain unpaid. The court concluded that Barbara's medical bills and expenses were martial debt, and Virgil would be responsible for 50 percent of "medical bills incurred from the date of the marriage up to and including the date of final dissolution."

¶10 As for property, Virgil expended considerable effort in attempting to persuade the District Court that his transfer of interest to his parents during his marriage to Barbara removed certain properties from the marital estate. He also asserted that the ranching operation was his, alone, due primarily to the fact that it was his work-comp settlement that originally secured the loan for the ranching property. He further claimed that during the course of the marriage he accounted for approximately 90 percent of the labor in working the ranch.

¶11 Another point of contention concerned Barbara's transfer of interest on the Highway 48 property at the time of separation. Virgil claims she came to him, asking for money with which she could purchase a house in Opportunity. Allegedly, he agreed to provide her $8,000, but required that she convey her interest in the Highway 48 property, which at the time was worth approximately $68,000. Barbara contended that her decision to convey this interest in exchange for the $8,000 was made while she was under tremendous stress due to her medical condition and the circumstances surrounding their separation. The court determined that the $8,000 paid to Barbara for her interest in the Highway 48 property was unconscionable. The court set aside the deed, and determined that the $8,000 would be an offset to her share of the marital estate.

¶12 The court further concluded that, pursuant to Montana law, the disposition of the property in this matter need not be equal, but it must be equitable. The court found that Virgil's ranch account balance grew, in part, due to Barbara's employment income contributions, which provided the couple with food and living expenses. The court also found that the couple kept much of their respective finances separate, with little co-mingling. For example, Virgil and Barbara each had separate brands for their cattle. The court determined that, notwithstanding the various transfers of interest made by Virgil to

his parents as well as the various assertions that property was kept separate, Barbara should have a 50-percent interest in all of the property, including the cattle operation.

¶13 The court, however, awarded Virgil the entire balance of his bank account, which included the settlement funds which served as collateral. The court required that Virgil assume sole responsibility for the debt on the various ranch properties. In turn, the court awarded Barbara her entire PERS account, as well as her home in Opportunity, which included the debt, and a vehicle, which also included debt.

¶14 Finally, the court declared that the parties had presented insufficient information regarding: 1) the value of the Highway 48 property; 2) land acquisitions; and 3) the costs and expenses of Barbara's cancer treatment. The court suggested that Virgil and Barbara should have such assets and debts appraised, and divide the resulting value equally. If not, the court insisted it would order such an appraisal, at the expense of the parties, and accordingly divide the marital estate. The court concluded that "the parties are specifically ordered to follow the terms of this Decree of Dissolution of Marriage and to execute whatever documents are necessary to effectuate the terms of this Decree."

## STANDARD OF REVIEW

¶15 We review the division of marital property by a district court to determine whether the findings upon which the district court relied are clearly erroneous. *In re Marriage of Engen*, 1998 MT 153, ¶ 26, 289 Mont. 299, ¶ 26, 961 P.2d 738, ¶ 26. "If the findings are not clearly erroneous, we will affirm the distribution of property unless the district court abused its discretion." *Engen*, ¶ 26 (citations omitted). The test for abuse of discretion in a dissolution proceeding is "whether the district court acted arbitrarily without employment of conscientious judgment" or whether the district court "exceeded the bounds of reason resulting in substantial injustice." *Engen*, ¶ 26 (citation omitted).

¶16 Finally, the standard of review of a district court's conclusions of law is whether the conclusions are correct. *See Scott v. Scott* (1997), 283 Mont. 169, 173, 939 P.2d 998, 1000 (citations omitted).

## DISCUSSION

### *Issue 1.*

*Did the District Court err in concluding that no evidence was presented which supported the execution of an antenuptial agreement?*

¶17 Virgil's arguments concerning the antenuptial, or prenuptial, agreement that he and Barbara allegedly signed are substantially without merit for several reasons.

¶18 First, and foremost, he misconstrues the importance of Rule 1004, M.R.Evid., in this action. Rule 1004 is an exception to what is commonly referred to as "the best evidence rule," and pertains exclusively to admissibility of evidence when the content of a document is in dispute.

¶19 Under Montana's "best evidence rule," Rule 1002, M.R.Evid., "[t]o prove the content of a writing . . . the original writing . . . is required, except as otherwise provided by statute, these rules, or other rules applicable in the courts of this state." *See Watkins v. Williams* (1994), 265 Mont. 306, 312, 877 P.2d 19, 22. Secondary evidence is admissible over a best evidence objection if one of the requirements set forth under Rule 1004, M.R. Evid., has been met and proper foundation is laid. *See Watkins*, 265 Mont. at 312, 877 P.2d at 22.

¶20 The relevant portion of Rule 1004 pertains to the admissibility of "other evidence" that may, under certain circumstances, be offered to demonstrate the "contents of a writing, recording, or photograph," when the original has been "lost or destroyed." Typically, as Barbara points out, when the document is a contract, a photocopy of the enforceable agreement is admissible in the event the original is established as unavailable. *See generally Morris v. Langhausen* (1970), 155 Mont. 362, 365-66, 472 P.2d 860, 862 (distinguishing between "photostatic copies" and "carbon copies" under best evidence rule).

¶21 Virgil alleged he lost the agreement--or at least he could not find it--which established the foundation for the application of Rule 1004. Counsel for Barbara did not dispute this assertion. Rather, the focus of her counsel's objection was that an unexecuted copy could not be admitted as a representation of an executed agreement.

¶22 Virgil then offered *other evidence* that a properly executed prenuptial agreement existed, one that would determine the rights of the parties. The court did not limit the introduction of such evidence, pursuant to Rule 1004, even though the rule pertains to the contents rather than the actual existence of the document. Virgil's copy of the alleged lost

original--an *unsigned* copy no less--was perfectly admissible.

¶23 Virgil also provided documentation that he and Barbara each made a list of property they each owned and would subsequently bring into the marriage, indicating that a prenuptial agreement was contemplated by both parties. Barbara does not dispute that the lists admitted into evidence were genuine, and that she in fact drafted such a list prior to their marriage. Again, all such evidence was admissible as secondary evidence.

¶24 Virgil also testified that his attorney--his current counsel's father--drafted the agreement, a legal service for which he paid. Other than the unsigned copy, however, no other evidence beyond Virgil's testimony was offered to substantiate this claim. He testified that on June 1, 1989, he and Barbara went to the offices of Joseph Connors, Sr., and signed the agreement. Likewise, this allegation was not substantiated with further evidence. No record from Joseph Connors, Sr.'s files of this event were produced. Apparently, the agreement also would have been notarized. No evidence of this was offered. No other third-party corroboration testimony was offered.

¶25 The only evidence that the agreement was ever signed, therefore, was Virgil's testimony of his own recollections, which was rebutted by Barbara's recollection that no such event occurred. Therefore, the secondary evidence could not establish that an enforceable prenuptial contract--which, by definition, requires the signatures of both parties--ever existed. *See* § 40-2-604, MCA (providing that a premarital agreement must be in writing and signed by both parties).

¶26 Thus, Virgil's argument that he met an evidentiary burden imposed by Rule 1004, one that would magically transform circumstantial evidence of a signed agreement into a legally binding document, and that the court in turn ignored his efforts, must fail. The evidentiary question here turns not on admissibility, but rather on the weight of the evidence admitted. Rule 1004, M.R.Evid., therefore, is entirely irrelevant to the District Court's determination that the evidence simply did not support Virgil's claim that a prenuptial agreement between the parties was ever executed.

¶27 This same line of reasoning applies to Virgil's request that this Court dust off an 1894 decision, along with two others, which he claims squarely address the evidentiary question here. He argues that he, like the testifying party in *Brooke v. Jordon*, established the necessary foundation for secondary evidence, in that he, too, diligently searched for the lost prenuptial agreement. We find the cases cited instructive, but not for the reasons

Virgil would prefer.

¶28 The testimony offered in *Brooke*, which substantiated the contents of a lost deed, came not from a party, but from the decedent party's attorney, who testified he had reviewed the deed, and ascertained it was "a good and sufficient" instrument, and then stored this valid original in his safe. *See Brook*e, (1894) 14 Mont. 375, 377, 36 P. 450, 451. The attorney then testified that the safe had been robbed, and that the original deed had been stolen, along with the rest of the contents of the safe, by an employee who later admitted to burning the stolen documents. *Brooke*, 14 Mont. at 377, 36 P. at 451. This testimony substantiated other introduced evidence, which showed that the deed in question had been conveyed to Brooke in 1875 through a probate court trustee. Based on this evidence, Brooke's ownership of the parcel in question (i.e., the contents of the lost deed) was substantiated. *See also Territory v. Stalker* (1889), 9 Mont. 6, 22 P. 496 (applying rule to the contents of a missing criminal complaint); *Kyle v. Kingsbury* (1922), 63 Mont. 145, 206 P. 346 (applying rule to the contents of a missing letter).

¶29 Here, Virgil did not offer any other evidence similar to the evidence described in the foregoing case law. Therefore this Court's decision in *Brooke*, as well as *Stalker* and *Kyle*, is of little use to his argument. Again, the alleged fact that Virgil lost and subsequently searched for the prenuptial agreement was never contested. What remained in dispute was whether the lost agreement was, in fact, signed and therefore enforceable.

¶30 Finally, Virgil entirely mis-characterizes Barbara's testimony regarding her recollection of the prenuptial agreement. He claims on page 3 of his brief that she "does not recall whether she signed the agreement or not," and cites to pages 19, 32, 33, and 34 of the trial transcripts. On page 19, Barbara was asked "Do you remember being presented with a written agreement [at the office of Joe Connors, Sr.]?

A. No.

Q. Then obviously you weren't able to sign an agreement?

A. No. We never went and signed it.

Q. Is there a reason why that document wasn't signed?

A. I don't know. We just . . . I don't know . . . we did it and then we kind of just

forgot about it.

This testimony is a far cry from a party who is simply unable to recall a particular event. If anything, this testimony indicates that a prenuptial agreement was contemplated, and in fact drafted for Virgil, but never executed.

¶31 On cross-examination, Barbara affirmed that she did not recall signing any agreement, and in fact testified that she requested a copy of the unexecuted agreement from Connor's firm, which was subsequently produced. That Virgil's attorney retained an unsigned, rather than a signed, agreement speaks far more loudly and clearly than the evidence set forth by Virgil. Ultimately, where the existence of an executed agreement boiled down to Virgil's word against Barbara's, the District Court determined that the weight of the evidence shifted in her favor.

¶32 We therefore hold that the court did not abuse its discretion when it determined that Virgil failed to present evidence that an enforceable antenuptial agreement was executed by him and Barbara. We further hold that the court's application of Rule 1004 to the proceedings was correct in all respects.

## Issue 2.

*Did the District Court err in the dividing of the property of the parties, thus requiring a remand?*

¶33 Virgil argues that this case should be remanded so that further competent evidence may be submitted to determine the values of property which remain in dispute. Virgil offers an extensive list of determinations made by the District Court which he argues do not serve the court's stated purpose of achieving an equitable division of the marital estate. In turn, these contentions can be logically channeled into two categories: 1) determinations that the court made; and 2) those determinations which the court failed to make. Largely, his contentions regarding the former of these two categories are without merit.

## A. Incorrect valuations of marital assets and debts

¶34 Under this category of alleged errors, Virgil has essentially requested that we remand so that the District Court can do again that which it has already done. We are acutely

mindful of the governing rule that a presumption exists in favor of a district court's judgment in such matters, which is accorded a great amount of deference upon review. *See In re Marriage of Johnson* (1987), 225 Mont. 404, 405-06, 732 P.2d 1345, 1346; *In re Marriage of Garner* (1989), 239 Mont. 485, 487-88, 781 P.2d 1125, 1127. Resorting to a summary approach--which these particular issues clearly deserve--we conclude that the evidence was not clearly erroneous, the court did not abuse its discretion, and any conclusion of law made was correct regarding the following:

¶35 *1. Barbara's medical bills*. It was well within the court's discretion to determine that these medical costs were marital debt that should be equally shared. This finding and conclusion is affirmed.

¶36 *2. The equitable division of the ranch operation*. Virgil states he is disabled and suffers from several physical ailments, including a bad shoulder, a bad back, a bad knee, and a heart condition. He further claims that the ranch is small and for his "recreation," and that it is not a money-making concern. He then claims that Barbara could not have possibly contributed an equal share of labor to what he characterizes as a "hobby" because she worked "until 3:00 p.m. each weekday."

¶37 We conclude that the District Court relied on substantial evidence--particularly the testimony of friends and neighbors--in concluding that the ranch operation was sustained by an equal contribution of both labor and resources by the parties. The evidence clearly shows that Barbara's partnership interest, of 8.44 percent, was for tax purposes only. The evidence further shows that her nursing income covered much of their living costs. Finally, aside from the period where her physical condition was weakened by her cancer treatment, she routinely contributed her share of labor to the ongoing operation of the ranch. Thus, the findings and conclusions pertaining to the equal division of the ranch are affirmed.

¶38 *The home on Warren Street*. There is substantial evidence that the home belonged to Virgil and not his father, and that it was properly included in the marital estate. Whatever motive prompted Virgil's transfer of this property to his father is immaterial. Although incorrectly stating that Virgil "placed property in the name of his parents in order to protect it from his ex-wife *and from Petitioner*" (the record adequately demonstrates that Virgil's acts of deception were targeted at his first ex-wife only, and not Barbara, his second wife), the District Court's findings and conclusion, that the value of the home is part of the marital estate and should be equitably divided, are affirmed.

¶39 *The $8,000 payment for Barbara's interest in Highway 48 property*. The evidence indicates that Virgil paid Barbara $8,000 for her interest in the Highway 48 property that was valued at between $68,000 and $78,000--virtually at the moment Barbara separated from him and left the ranch. The District Court concluded that this sum resulted from coercion, in that Virgil exploited Barbara's financial and emotional duress to his advantage. The court relied on this Court's decision in *Best v. Best* (1982), 202 Mont. 109, 656 P.2d 201, in determining that the transaction was unconscionable. We agree with the court's determination and affirm.

¶40 The record clearly shows that Virgil maneuvered Barbara into an untenable economic crisis, and then took advantage of her by making the proverbial offer that she could not refuse. Although not as severe as the circumstances described in *Best*, it was equally opportunistic. True, Barbara came to him requesting money--but not in exchange for her interest in marital property. Further, her decision was not made with the advice of counsel. *See also Stanley v. Holms*, 1999 MT 41, ¶¶ 39-42, 293 Mont. 343, ¶¶ 39-42, 975 P.2d 1242, ¶¶ 39-42 (discussing *Litten v. Jonathan Logan, Inc.* (1971), 220 Pa.Super. 274, 286 A.2d 913, and noting that party must contribute to financial crises where unconscionability due to financial duress is alleged).

¶41 *Barbara's PERS retirement account and the house in Opportunity*. Why Virgil has chosen to quibble over these distributions is difficult to ascertain. The District Court, in its discretion, allowed each party to keep their respective sources of retirement. Additionally, Virgil's ranch account, which steadily increased in value, and which provides him with more than $3,000 in annual interest, was left undisturbed. Further, although Barbara was awarded her house in Opportunity, she was also awarded the privilege of paying off the mortgage. The foregoing determinations are, accordingly, affirmed.

## B. Failure to value marital assets

¶42 The lone meritorious assertion Virgil offers in the midst of his eight issues on appeal is whether the District Court erred by not assigning a value to certain identifiable marital assets. This Court has held that it is an abuse of discretion for a district court to fail to "identify or describe the assets acquired during the marriage, or assign values to them, and [fail] to consider the contingent liabilities associated with those assets." *In re Marriage of Smith* (1994), 264 Mont. 306, 310-11, 871 P.2d 884, 887 (citing *In re Marriage of Dirnberger* (1989), 237 Mont. 398, 401-402, 773 P.2d 330, 332). In *Dirnberger*, this Court stated:

Only after a finding of net worth can the trial court make an equitable apportionment. The District Court must make complete findings of fact, including assets and liabilities, from which can be established a net worth of the parties . . . . Additionally, "[i]f the District Court's findings and conclusions do not reflect the net worth of the parties' marital assets at the time of their divorce, this Court on appeal cannot determine if the property was equitably divided."

*Dirnberger, 237 Mont. at 401, 773 P.2d at 332 (citations omitted).*

¶43 Here, the District Court, in its conclusions of law, stated:

[I]t is the intent of this Court to divide the marital estate equally. However, neither Petitioner or Respondent have supplied this Court with sufficient information in order to arrive at a value for the marital estate.

The court then provided examples of this insufficiency which included the value of the Highway 48 property, other land acquisitions, and a precise figure for the medical bills and expenses associated with Barbara's cancer treatment. The court then suggested that Virgil and Barbara should have these marital assets and debts appraised, and divide the resulting value equally. The court then warned that:

If the parties can not agree, the Court will order the appraisal with the costs of the appraisal to be divided equally between the parties. The Court would then divide the value of the marital estate equally.

Finally, the court decreed that "the parties are specifically ordered to follow the terms of this Decree of Dissolution of Marriage and to execute whatever documents are necessary to effectuate the terms of this Decree."

¶44 We conclude, therefore, that while the court did not determine a specific dollar amount in its "final" decree, the parties here, namely Virgil, simply did not follow the court's explicit instructions. Rather, Virgil chose to bring this appeal without first pursuing the court-recommended appraisals. Finding no errors thus far in the court's determinations, we remand this matter so that court can fulfill its promise: to do that which the parties are apparently incapable of doing themselves.

¶45 Affirmed and remanded.

/S/ JAMES C. NELSON

We Concur:

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER