DA 07-0066

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 175

COREY and KIMBER THOMPSON,

      Plaintiffs and Appellants,

   v.

LITHIA CHRYSLER JEEP DODGE OF GREAT FALLS,
A.B.N. of LITHIA OF GREAT FALLS, INC.; DAIMLER
CHRYSLER SERVICES NORTH AMERICA LLC;
DAIMLER CHRYSLER FINANCIAL SERVICES AMERICAS
LLC; CHRYSLER FINANCIAL; and JEFFERY CROCKER,

      Defendants and Appllees.

| | |
|---|---|
| APPEAL FROM: | District Court of the Eighth Judicial District, In and For the County of Cascade, Cause No. BDV 06-299 Honorable Julie Macek, Presiding Judge |

COUNSEL OF RECORD:

      For Appellants:

          Stacy Tempel-St. John, Attorney at Law; Great Falls, Montana

      For Appellees:

          John Eric Bohyer, Attorney at Law; Missoula, Montana

          Dennis J. Tighe, Attorney at Law; Great Falls, Montana

          Submitted on Briefs:  September 26, 2007

                Decided:  May 20, 2008

Filed:

                                    Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Corey and Kimber Thompson (Thompsons) appeal from the order of the District Court for the Eighth Judicial District, Cascade County, granting the Defendants' motions to compel arbitration of Plaintiffs' claims related to a 2005 transaction for a truck. We reverse and remand.

¶2 We restate the issues on appeal as follows:

1. Where a contract containing an arbitration clause is challenged on the basis of the failure of a condition precedent to contract formation, who is the appropriate adjudicator, an arbitrator or the court?

2. Was the approval of financing upon terms stated in the contract documents a condition precedent to the formation of a contract between the parties?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On January 31, 2005, the Thompsons went to the Lithia Chrysler Jeep Dodge of Great Falls (an assumed business name of Lithia of Great Falls, Inc., hereinafter "Lithia") automobile dealership with the intention of purchasing a new vehicle. The Thompsons identified a 2005 Dodge Ram 1500 (Dodge truck) they wished to purchase, which had a sales price of $39,224. The Thompsons made a cash down payment of $2,000 on the Dodge truck, traded in their 2000 GMC Sierra 2500 (GMC truck), which had a trade-in value of $23,612 (offset by a $22,100 loan pay-off for a net trade-in allowance of $1,512), and offered to finance the remainder.

¶4 The Thompsons signed a Retail Installment Contract (Contract) with Lithia. The Contract listed the transaction for the Dodge truck as having an annual percentage rate of

2

3.9 percent. The reverse side of the Contract contained a number of terms and conditions, including a series of arbitration provisions. One of these stated:

> Any claim or dispute, whether in contract, tort or otherwise (including any dispute over the interpretation, scope, or validity of the contract, the arbitration clause or the arbitrability of any issue), between us or Creditor's employees, agents, successors or assigns, which arise out of or relate to a credit application, this contract, or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at the election of either of us (or the election of any such third party), be resolved by a neutral, binding arbitration and not by a court action.

The Contract further provided that "[i]f either of us chooses, any dispute between us will be decided by arbitration and not in court," and "[i]f a dispute is arbitrated, each of us will give up the right to a trial by a court or a jury trial."

¶5    The Thompsons also signed a Vehicle Buyer's Order (Order), which likewise listed the annual percentage rate at 3.9 percent and contained a number of terms and conditions. The front of the Order contained a "Notice to Purchaser" which stated:

> If this transaction is to be a retail installment sale, then this order is not a binding contract to the dealer and dealer shall not be obligated to sell until approval of the terms hereof is given by a bank or finance company willing to purchase a retail installment contract between the parties hereto based on such terms. If this approval is obtained, however, this order is a binding contract. If the purchaser is obtaining his own financing, this order is a binding contract as it is written. If a purchaser has received a copy of a retail installment contract as a part of this transaction, it shall not be binding to the dealer until accepted by the bank or finance company to which it will be assigned.

The Order likewise addressed arbitration, stating that "any controversy or claim arising out of or relating to this order, or breach thereof, shall be settled by arbitration . . . ."

3

¶6    The Thompsons were permitted to take the Dodge truck home, and they operated it for a little over a week.  The Thompsons allege that, on February 8, 2005, Lithia's Finance Manager, Jeffery Crocker, contacted them and told them that they would need to sign new finance papers with a higher annual percentage rate of 4.9 percent.[1]  The Thompsons contend that they refused to accept a higher rate and that Crocker informed them that they would have to return the Dodge truck if they failed to sign.  The Thompsons allege that they brought the Dodge truck back to Lithia's dealership that same day and attempted to recover the GMC truck they had offered in trade, but Lithia informed them that it had already been sold and that Lithia refused to return the Thompsons' $2,000 cash down payment.  The Thompsons maintain that Lithia refused to accept the Dodge truck at this point, but they left the truck with its keys at the dealership.

¶7    After returning the Dodge truck, the Thompsons claim that they contacted Daimler Chrysler Services North America (now Daimler Chrysler Financial Services Americas, d/b/a Chrysler Financial) (hereinafter "DCFS") several times to verify that the Contract and Order were not enforced.  They claim that DCFS informed them that there was no record of a loan.  Later, Lithia submitted financing papers to DCFS, which accepted the loan.  On January 9, 2006, counsel for the Thompsons received a letter from Lithia's counsel stating that although the contract signed by the Thompsons contained a provision "allowing the dealership the right to rescind the contract" in the event the dealership could not sell the loan for the quoted rate, Lithia decided, rather than rescind the

---

[1]Many of the Thompsons' assertions are contested by the Defendants.  Because the District Court granted Defendants' motion to stay the proceedings, the parties did not conduct any discovery and the District Court did not enter any findings of fact.

4

transaction, to execute a "rate buy down concession." According to the letter, the "rate buy down concession" occurred when "the dealership paid money towards the loan on [Thompsons'] behalf so that the interest rate reflected on the original contract could be maintained."

¶8 The Thompsons filed suit against the above-named Defendants on March 1, 2006, bringing six causes of action: (1) Fraud; (2) Conversion; (3) Damage of Chattle (sic) with Malace (sic); (4) Negligence; (5) Violation of the Montana Consumer Protection Act; and (6) Punitive Damages. DCFS subsequently filed a motion to stay the proceedings and compel arbitration on April 18, 2006, on the ground that the Federal Arbitration Act and § 27-5-115, MCA, required the parties' dispute to be settled in arbitration, as the Contract contained an arbitration clause. Defendants Lithia and Crocker filed a similar motion on May 9, 2006, as well as a motion seeking a protective order to preclude the Thompsons from conducting any discovery while the court considered the Defendants' motions. DCFS followed with its own motion for a protective order the following day.

¶9 The District Court entered an order on December 15, 2006, granting the Defendants' motions to compel arbitration and to stay the proceedings. In reaching its decision, the District Court relied on the United States Supreme Court's holding in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 126 S. Ct. 1204 (2006), that "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator," *Buckeye*, 546 U.S. at 449, 126 S. Ct. at 1210, and our subsequent recognition of *Buckeye*'s holding in *Martz v. Beneficial Montana, Inc.*,

5

2006 MT 94, 332 Mont. 93, 135 P.3d 790.  The District Court concluded that because the Thompsons were challenging the contract as a whole, and not just the arbitration clause, *Buckeye* and *Martz* required that the matter be heard by the arbitrator.  This appeal followed.

## STANDARD OF REVIEW

¶10     We review a district court's order granting a motion to compel arbitration de novo. *Martz*, ¶ 10.  We review a district court's conclusions of law to see if they are correct. *Martz*, ¶ 10.

## DISCUSSION

¶11     ***Issue One.  Where a contract containing an arbitration clause is challenged on the basis of the failure of a condition precedent to contract formation, who is the appropriate adjudicator, an arbitrator or the court?***

¶12     The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16, governs contracts "involving commerce" that contain arbitration clauses.  *Martz*, ¶ 12.  The FAA evidences a federal policy favoring arbitration and placing arbitration agreements on equal footing with all other contracts.  *Buckeye*, 546 U.S. at 443, 126 S. Ct. at 1207-08.  The FAA "created a body of federal substantive law which was applicable in state and federal courts."  *Buckeye*, 546 U.S. at 445, 126 S. Ct. at 1208-09 (internal quotation marks and brackets omitted).  The FAA provides that an agreement to arbitrate is valid save upon such grounds as exist at law or in equity to revoke the contract.  9 U.S.C. § 2.  Montana law similarly recognizes the validity and enforceability of arbitration clauses "except upon grounds that exist at law or in equity for the revocation of a contract."  Section 27-5-114, MCA.

6

¶13  In *Buckeye*, the Supreme Court examined the FAA in the context of a challenge to a contract containing an arbitration clause, and outlined three key principles of federal arbitration law.  First, "an arbitration provision is severable from the remainder of the contract."  *Buckeye*, 546 U.S. at 445, 126 S. Ct. at 1209.  Second, and most relevant to this appeal, "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."  *Buckeye*, 546 U.S. at 445-46, 126 S. Ct. at 1209.  Finally, the Supreme Court reaffirmed that "this arbitration law applies in state as well as federal courts."  *Buckeye*, 546 U.S. at 446, 126 S. Ct. at 1209.  The Supreme Court concluded that because the respondent challenged the validity of the contract as a whole, and not the arbitration clause specifically, the challenge had to go to the arbitrator.  *Buckeye*, 546 U.S. at 449, 126 S. Ct. at 1210.

¶14  Shortly after the Supreme Court decided *Buckeye*, we considered, in *Martz*, a similar challenge to the validity of a contract containing an arbitration clause as being void *ab initio*.  Based on *Buckeye* and the earlier Supreme Court decisions of *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S. Ct. 1801 (1967) and *Southland Corp. v. Keating*, 465 U.S. 1, 104 S. Ct. 852 (1984), we held:

> (1) Where a complaint challenges a contract's arbitration clause specifically, the *Prima Paint* doctrine of severability in conjunction with the FAA allows a court to hear the challenge, and (2) where a complaint challenges a contract as a whole, *Prima Paint* and *Buckeye Check Cashing* require a court to grant a motion to compel arbitration if the contract contains an arbitration provision.

*Martz*, ¶ 18.  We concluded that the Martzes' challenge to the contract as a whole, as being void *ab initio*, was a matter to be properly decided via arbitration.  *Martz*, ¶ 18; s*ee*

7

*also Kingston v. Ameritrade, Inc.*, 2000 MT 269, ¶ 15, 302 Mont. 90, ¶ 15, 12 P.3d 929, ¶ 15 ("a district court may only properly adjudicate the validity of an arbitration agreement when a party contests the validity of an arbitration clause within a contract, but does not contest the validity of the contract as a whole.").

¶15     The Thompsons acknowledge the holdings of *Buckeye* and *Martz* but maintain that their situation is distinguishable on the ground that they are challenging the *existence* of a contract containing an arbitration clause, rather than the *validity* of such a contract (as was the case in both *Buckeye* and *Martz*). They argue that the "facts of the case at hand are one step prior to those in *Martz*" and that if the contract does not exist, then there is no agreement to arbitrate. They maintain that the contract, and arbitration clause therein, never came into existence due to the failure of a condition precedent—namely, approval of the Order and Contract by a bank or finance company at the interest rate of 3.9 percent. Since Lithia allegedly requested that the Thompsons either sign new papers at a higher rate or return the truck, which the Thompsons assert they did prior to approval of financing, the Thompsons claim that the condition precedent was not met and no contract was formed. The Thompsons argue, consequently, there was no arbitration clause and no obligation to engage in arbitration. The Defendants reply that the distinction between a challenge to the existence of a contract and a challenge to the validity of a contract is one without a difference, and argue that the Thompsons must submit the matter to the arbitrator pursuant to *Buckeye* and *Martz*.

¶16     The Ninth Circuit recently considered a challenge to the existence of a contract containing an arbitration clause and concluded that the challenge was a matter for the

8

court to consider, distinguishing it from *Buckeye*. In *Sanford v. Memberworks, Inc.*, 483 F.3d 956 (9th Cir. 2007), the plaintiff argued that she never agreed to a "membership agreement" containing an arbitration clause and thus, a basic requirement for formation of a contract had not been met. Analyzing the case in light of *Buckeye*, the Ninth Circuit stated, "[i]ssues regarding the validity or enforcement of a putative contract mandating arbitration should be referred to an arbitrator, but *challenges to the existence of a contract as a whole* must be determined by the court prior to ordering arbitration." *Sanford*, 483 F.3d at 962 (emphasis added). The Ninth Circuit had previously interpreted the FAA to require that the court consider "not only challenges to the arbitration clause itself, but also challenges to the making of the contract containing the arbitration clause." *Sanford*, 483 F.3d at 962. This interpretation did not change after *Buckeye*. *See Sanford*, 483 F.3d at 962 n. 8, 963. In sum, because the plaintiff challenged the existence of the contract, the Ninth Circuit concluded that the district court was required to rule on the contract formation issue prior to compelling arbitration. *Sanford*, 483 F.3d at 962. *See also Will-Drill Resources, Inc. v. Samson Resources Co.*, 352 F.3d 211, 219 (5th Cir. 2003) ("In contrast, where the very existence of an agreement is challenged, ordering arbitration could result in an arbitrator deciding that no agreement was ever formed. Such an outcome would be a statement that the arbitrator *never* had any authority to decide the issue."

¶17 The Ninth Circuit highlighted the fact that the Supreme Court, in a *Buckeye* footnote, had recognized the distinction between the validity of a contract and the

9

question of whether a contract had been formed. *Sanford*, 483 F.3d at 962 n. 8. There, the Supreme Court stated:

> The issue of the contact's validity is different from the issue of whether any agreement between the alleged obligor and obligee was ever concluded. Our opinion today addresses only the former, and does not speak to the issue decided in the cases cited by respondents (and by the Florida Supreme Court), which hold that it is for courts to decide whether the alleged obligor ever signed the contract, *Chastain v. Robinson-Humphrey Co.*, 957 F.2d 851 (C.A.11 1992), whether the signor lacked authority to commit the alleged principal, *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99 (C.A.3 2000); *Sphere Drake Ins. Ltd. v. All American Ins. Co.*, 256 F.3d 587 (C.A.7 2001), and whether the signor lacked the mental capacity to assent, *Spahr v. Secco,* 330 F.3d 1266 (C.A.10 2003).

*Buckeye*, 546 U.S. at 444 n. 1, 126 S. Ct. at 1208 n. 1. The fact that the Supreme Court distinguished between contracts that are void and contracts that never existed in the first place supports the Thompsons' contention that there is a difference between challenging the validity of a contract as a whole (as void *ab initio*, for example) and challenging the existence of a contract.

¶18　Other post-*Buckeye* decisions have likewise held that the issue of whether a contract was ever formed is properly a matter for a court to consider. The United States District Court for the Southern District of Florida recently examined this issue and explained "an exception to this general rule exists for cases where not merely the enforceability, but the initial formation or existence of a contract, including a disputed arbitration clause is legitimately called into question, and must be decided by the court." *Krutchik v. Chase Bank USA, N.A.*, 531 F.Supp.2d 1359, 1363 (S.D. Fla. 2008) (internal quotation marks omitted). In *Foss v. Circuit City Stores, Inc.*, 477 F.Supp.2d 230 (D. Me. 2007), the United States District Court for the District of Maine stated "a challenge

10

to whether a contract was ever validly concluded is for the court, and not the arbitrator, to decide." *Foss*, 477 F.Supp.2d at 235; *see also Operis Group, Corp. v. E.I. at Doral, LLC*, 973 So. 2d 485, 488-89 (Fla. 3d Dist. App. 2007).

¶19    We agree with the above-cited authority.  When a party challenges a contract containing an arbitration clause on the ground the parties never entered a contract, the court, not arbitration, is the appropriate forum to determine whether a contract existed, prior to compelling arbitration.  If formation of a contract never occurred, then the parties never agreed to arbitrate and it would be inappropriate to submit the matter to arbitration. This is a narrow exception to the rule established in *Buckeye* and *Martz.  See Bruni v. Didion*, 73 Cal. Rptr. 3d 395, 406 (Cal. App. 4th Dist. 2008), citing *Buckeye*, 546 U.S. at 444 n. 1, 126 S. Ct. at 1208 n. 1 ("A court, however, still must consider one type of challenge to the overall contract: a claim that the party resisting arbitration never actually agreed to be bound.")

¶20    Having determined that the court is the proper body to hear a challenge to the existence of a contract containing an arbitration provision, we must now examine whether failure of a condition precedent is such a contract formation issue.  When deciding whether an agreement to arbitrate has been reached by the parties, courts look to state law principles of contract formation.  *Avedon Engineering, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997) citing *Perry v. Thomas*, 482 U.S. 483, 492 n. 9, 107 S. Ct. 2520, 2527 n. 9 (1987).  Accordingly, we examine Montana law regarding conditions precedent and contract formation.

11

¶21 "An obligation is conditional when the rights or duties of any party thereto depend upon the occurrence of an uncertain event." Section 28-1-401, MCA. "A condition precedent is one which is to be performed before some right dependent thereon accrues or some act dependent thereon is performed." Section 28-1-403, MCA. "Before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself . . . ." Section 28-1-406, MCA. *See also Management, Inc. v. Mastersons, Inc.*, 189 Mont. 435, 441, 616 P.2d 356, 360 (1980) (citing § 28-1-403, MCA).

¶22 It is important to distinguish between a condition precedent to the formation of a contract and a condition precedent to performance of a contract obligation. "In the law of contracts, conditions may relate to the existence of contracts or to the duty of immediate performance under them. Thus, there may be conditions to the formation of a contract, or conditions to performance of a contract." Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* vol. 13, § 38:4, 375 (4th ed., West 2000)); *see also Ex Parte Payne*, 741 So. 2d 398, 403 (Ala. 1999) (" 'In negotiating a contract the parties may impose any condition precedent, the performance of which is essential before they become bound by the agreement; in other words, there may be a condition precedent to the existence of a contract.' " quoting 17A Am. Jur. 2d *Contracts* § 34 (1991)); *Toland v. Kaliff*, 435 S.W.2d 260, 262 (Tex. Civ. App. 1968) ("The parties to a contract may agree that it shall not become effective or binding until or unless some specified condition is performed or occurs, in which case there is no binding contract until such condition has been complied with." (internal quotation marks and citations omitted)). As explained by

12

these authorities, if a condition precedent to formation is not fulfilled, then there is no agreement and the contract is not binding. This is distinguished from a condition precedent to performance of a contract obligation, which assumes the contract was formed.

¶23 A challenge to a contract containing an arbitration clause on the ground of a failure of a condition precedent to formation goes directly to whether the parties formed a contract and, on the basis of the above-discussed authorities, the matter is appropriate for the court to hear, instead of an arbitrator. We thus agree with the Thompsons that the District Court erred in granting the motion to compel arbitration at this juncture. The question of whether a contract was formed by the parties must first be determined by the court.

¶24 *Issue Two. Was the approval of financing upon terms stated in the contract documents a condition precedent to the formation of a contract between the parties?*

¶25 The Thompsons argue that the plain language of the Contract and Order makes clear that there was no binding contract until the Contract and Order were accepted by the bank or finance company, i.e., that approval of 3.9 percent financing of their purchase was a condition precedent to formation of the contract. The Order states:

> If this transaction is to be a retail installment sale, then this order is not a binding contract to the dealer and dealer shall not be obligated to sell until approval of the terms hereof is given by a bank or finance company willing to purchase a retail installment contract between the parties hereto based on such terms. If this approval is obtained, however, this order is a binding contract. If the purchaser is obtaining his own financing, this order is a binding contract as it is written. If a purchaser has received a copy of a retail installment contract as a part of this transaction, it shall not be binding

13

to the dealer until accepted by the bank or finance company to which it will be assigned.

¶26 The construction and interpretation of contracts is a question of law for the courts to decide. *Chase v. Bearpaw Ranch Ass'n*, 2006 MT 67, ¶ 14, 331 Mont. 421, ¶ 14, 133 P.3d 190, ¶ 14. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible . . . ." Section 28-3-303, MCA. "The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." Section 28-3-202, MCA. "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." Section 28-3-401, MCA. Where the contract language is unambiguous and not subject to two different interpretations, we apply the language as written. *Hardy v. Vision Service Plan*, 2005 MT 232, ¶ 17, 328 Mont. 385, ¶ 17, 120 P.3d 402, ¶ 17.

¶27 The above-quoted language from the contract documents appears clear and explicit on its face and unambiguous, serving to demonstrate that the contract was dependent on approval of financing for the Thompsons upon the terms stated within the contract. However, DCFS points to the language in the Vehicle Order stating that neither the Contract nor the Order are binding *to the dealer* unless financing is obtained, and contends that the condition precedent only applies to the dealer, not the Thompsons. DCFS argues that "[n]othing in the sale documents indicate that the financing acceptance clause was a 'condition precedent' for *the Thompsons'* performance, and nothing in the

14

sale documents permit the Thompsons to repudiate the contract when the sale terms have not changed." (Emphasis added.)

¶28 However, though the express terms of the contract speak only of the dealer not being bound if financing is not approved, a review of the totality of the contract language clearly demonstrates the same is true for the Thompsons, even though not expressly stated. The Contract first states that the Thompsons agreed to buy the Dodge truck "on a credit price basis ('Total Sale Price')." The "Total Sale Price", defined by the Contract as "[t]he total price of your purchase on credit, including your down payment," was listed as $44,351.20. The contract explained that this amount included the total amount of payments ($38,539.20), which was calculated based on the amount financed ($34,899.00) at a 3.9 percent "annual percentage rate," which was explained as "[t]he cost of your credit as a yearly rate." The Contract listed the total finance charge as $3,640.20, or "[t]he dollar amount the credit will cost you." Thus, the total sales price agreed to by the Thompsons was based upon financing at the rate of 3.9 percent, and the corresponding finance charge they agreed to was likewise premised upon a 3.9 percent rate. A change in rate would thus change the finance charge and the total sales price for the vehicle, unless other terms were re-negotiated or adjusted. Although some of these financial figures were designated by the Contract as "Estimates," they were nonetheless calculated on the basis of the 3.9 annual percentage rate, which was not designated as an estimate.

¶29 Regarding a change in terms, paragraph 9 of the Contract states that "[a]ny change in this contract must be in writing and signed by all the parties . . . ." Paragraph 2 of the Vehicle Order provides that if the manufacturer changes the price to the dealer, the dealer

15

may change the cash delivered price to the purchaser; however, if the cash delivered price is increased by the dealer, "Purchaser may, if dissatisfied therewith, cancel this Order . . . ."

¶30    A review of the contract documents convinces us that the Thompsons agreed to purchase the Dodge for a specific price which was premised upon 3.9 percent financing, and that no contract would have been formed unless financing under those terms was approved.  To hold otherwise would potentially obligate the Thompsons to purchase the Dodge at whatever interest rate could be obtained.  Just as the contract was not binding on the dealer unless financing was approved at the stated terms, it was likewise not binding on the Thompsons without such approval.  Therefore, this was a condition precedent to the contract's formation.

¶31    The Thompsons further maintain that this condition precedent was not satisfied based on their assertions that Lithia requested that they sign new contract documents at a higher interest rate or return the truck, and that they refused the higher rate.  DCFS contends that the financing was accepted on the terms in the Order and Contract and also maintains that there is no document showing rejection of the terms by DCFS.  On this point, the Thompsons assert that such documents exist showing a financial institution rejected the 3.9 percent interest rate but that they have not been allowed to pursue discovery on the matter.  Further, the Thompsons point to the January 9, 2006 letter from Lithia's counsel indicating that Lithia performed a "rate buy down concession" to keep the Thompsons' original interest rate.

¶32 It is clear that there are questions of disputed fact which warrant further inquiry into whether the condition precedent was satisfied and the contract formed. These questions cannot be answered without further fact finding by the District Court.

¶33 The District Court erred by granting the Defendants' motion to compel arbitration and stay the proceedings. Therefore we remand the case to the District Court for further proceedings consistent herewith. Discovery will need to be conducted so that the factual issues related to whether the financing condition was satisfied may be determined.

¶34 Reversed and remanded.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS