JUSTICE SHEA
concurring.
¶110 The one issue upon which this Court unanimously agrees is that the District Court erred by allowing the jury to consider the TARP evidence. Prom that unanimous premise, the opinions diverge as to whether or not the erroneous admission of the TARP evidence compels reversal and remand. Justice Cotter, joined by Chief Justice McGrath and Justice Wheat, concludes that the admission of the TARP evidence *35 does not warrant a new trial. Concurrence and Dissent, ¶ 134. Based on my review of the record in this matter, I am compelled to conclude otherwise. I therefore concur with the majority on this issue.
¶111 Justice Cotter concludes reversal is not required because although the TARP evidence should not have been admitted, “The District Court instructed the jury on the law in the case, and none of the instructions invited the jury to consider TARP evidence and/or award damages as a result of the failure to extend TARP funds,” and “We presume the juiy follows the law.” Concurrence and Dissent, ¶ 139. However, though we may presume the jury follows the law, we have nevertheless repeatedly recognized that some evidence is so prejudicial as to raise the specter of a reasonable possibility that the inadmissible evidence might have contributed to the verdict. Martin v. BNSF Ry. Co., 2015 MT 167, ¶ 33, 379 Mont. 423, 352 P.3d 598;Boude, ¶ 21; Pacificorp, 254 Mont. at 398, 838 P.2d at 920. In such cases, we have determined that the only appropriate course is reversal.
¶112 I likewise cannot agree with Justice Cotter’s conclusion that “any potential harm predicated upon admission of the TARP evidence would be eliminated by virtue of [our] reversal of the more elastic awards of consequential and punitive damages.” Concurrence and Dissent, ¶ 140. In previous cases where we have found evidence so prejudicial as to warrant reversal, we have done so even when the inadmissible evidence pertained only to an issue of damages that was never reached by the jury because the verdict was rendered solely on the issue of liability. In so holding, “we recognized ‘that such evidence can have an impact upon a jury’s verdict on the issue of liability, as well as damages.’ ” Martin, ¶ 33 (quoting Mickelson v. Mont. Rail Link, Inc., 2000 MT 111, ¶ 46, 299 Mont. 348, 999 P.2d 985). Comerica’s liability in this case was hotly contested and far from clear. Indeed, Justice Rice, joinedby Justice McKinnon, concluded that Comerica was entitled to judgment as a matter of law and would hold that the entire matter should not have gone to the jury. Concurrence and Dissent, ¶ 114. While I disagree with this conclusion, it illustrates the point that the issue of liability — including liability for the economic damages I would otherwise be inclined to uphold — was by no means a foregone conclusion.
¶113 Finally, Justice Cotter observes that there was substantial evidence placed before the jury to support its verdict for Masters’ economic losses. Concurrence and Dissent, ¶ 144. While I agree with this observation, I cannot agree with the reasoning that the admission of the TARP evidence was therefore insufficient to compel a retrial. Concurrence and Dissent, ¶ 144. In Boude, we similarly observed that *36 there was substantial evidence to support the jury’s verdict on liability. Nevertheless, we reversed the jury’s verdict because we correctly observed: “Where the impact of clearly inadmissible evidence is conceivably outcome-determinative, we conclude the only appropriate course is reversal.” Boude, ¶ 21. In this case, there is no dispute that the TARP evidence was inadmissible. Viewing the record in its entirety, I must conclude that the impact of this evidence was, at a minimum, conceivably outcome-determinative. Therefore, I must conclude that the only appropriate course is reversal and remand.
JUSTICE RICE, concurring in part and dissenting in part.
“It is getting close to being out of time for this... . There is certainly no more moving the Bank and I was quite surprised they gave us until 12/29.”
-Internal email from Gregory Yaklin Vice Pres., Masters Group International December 17,2008 9:55 p.m.
¶114 I believe the District Court erred by failing to enter summary judgment in favor of Comerica on the issue of contract formation, and that, on this record, the issue was not one for the jury to decide. In my view, the Court has improperly analyzed the issue by failing to consider all of the uncontested evidence, place the transaction in the correct factual context, and properly apply the standards of summary judgment. I would reverse for entry of judgment in favor of Comerica, under either Montana or Michigan law, as the governing contractual principles are applicable in either jurisdiction.
¶115 Comerica moved for summary judgment, demonstrating that the prerequisites for entering the Forbearance Agreement, under which the Bank would forbear until February 16, 2009, had not all been satisfied. In response, Masters asserted that Comerica had waived the prerequisites for forming or entering the Forbearance Agreement, and that the jury should decide that question. To meet its responsive burden, Masters had to “set forth specific facts, not merely denials, speculation, or conclusory statements, in order to establish that a genuine issue of material fact does indeed exist.” Lorang v. Fortis Ins. Co., 2008 MT 252, ¶ 39, 345 Mont. 12, 192 P.3d 186 (citing M. R. Civ. P. 56(e)). If no genuine issues of material fact exist, then the court must determine whether the facts “entitle the moving parly to judgment as a matter of law.” Lorang, ¶ 39.
¶116 First, it should be noted that there is a distinction between conditions of contract formation and conditions of contract performance. See Thompson v. Lithia Chrysler Jeep Dodge of Great *37 Falls, 2008 MT 175, ¶ 22, 343 Mont. 392, 185 P.3d 332 (“[I]f a condition precedent to formation is not fulfilled, then there is no agreement and the contract is not binding. This is distinguished from a condition precedent to performance of a contract obligation, which assumes the contract was formed.”). In Thompson, an arbitration case, the qualitative difference in these conditions determined whether the court or an arbitrator was to decide the issue. Thompson, ¶ 23. All of the contract waiver authority cited by the Court addresses waiver of conditions of contract performance, not contract formation. Opinion, ¶¶ 81, 91-92. There is authority for the proposition that the law of waiver does not apply to prerequisites of contract formation, because contractual duties cannot arise until formation has occurred. The formation of a contract “marks the border between the law of offer and acceptance, which relates to the formation stage, and the law of conditions, which relates to the performance stage... . [T]he law of conditions includes the concept of waiver, while that of offer and acceptance does not.” IIE. Alan Farnsworth, Farnsworth on Contracts, § 8.2, 396 n.13 (2d ed. 1998). See also Restatement (Second) of Contracts § 224 cmt. c (1979) (contractual conditions are limited to “a duty under an existing contract,” as opposed to a prerequisite to contract formation, the latter which is excluded from the definition of a “condition.”). (Emphasis added.) Nonetheless, because this case was not argued or tried based on this distinction, I will assume herein that the prerequisites stated by Comerica were conditions that were subject to waiver. However, given that contract formation is precedent to contractual duty, our standard that “waiver is mainly a question of intention and must be manifested in some unequivocal manner” becomes even more critical here. Paulson v. Flathead Conservation Dist., 2004 MT 136, ¶ 39, 321 Mont. 364, 91 P.3d 569 (citing Thiel v. Johnson, 219 Mont. 271, 275, 711 P.2d 829, 832 (1985)).
¶117 Paulson also instructs that the unequivocal manifestation of waiver can be founded “upon express written statements, oral express statements or acts or conduct which induce the belief that the intention and purpose is to waive.” Paulson, ¶ 39. (Emphasis added.) The evidence here, when viewed in total and in factual context, convinces me that Comerica did not unequivocally waive the prerequisites to formation or execution of the Forbearance Agreement by express statements or by conduct that induced a belief that the intention and purpose was to waive. In fact, if anything was unequivocal, it was that Comerica would not waive any of the prerequisites. And Masters’ internal communications — both before and after the sweep of *38 funds — showed that it understood exactly that.
¶118 Although the Court sets forth some factual background, it decides this issue after a brief discussion and primarily on a generic reference to the record evidence, that Comerica’s conduct throughout this financial transaction was enough to defeat summary judgment. Opinion, ¶ 89.1 believe this shortchanges the evidence and fails to emphasize important facts that establish the full context of the transaction, including Masters’ clear understanding of Comerica’s intentions.
¶119 It should first be understood that this was a major transaction, involving international commerce, international banking, millions of dollars and sophisticated parties with legal counsel. This was not a transaction between a rural hometown bank and a local business, where the parties’ conduct and informal dealings over time may have established expectations based upon those patterns. Here, the formal pattern was set from the beginning of the transaction: careful documentation was prepared and required for every aspect of the transaction. These facts, like those mentioned below, are uncontested.
¶120 The due date on the initial two-year, $9 million loan was July 11,2008. Masters borrowed additional sums two times prior to this due date, but at each step of the transaction, Comerica made it clear in writing that the additional advancement of funds constituted neither a “waiver of any defaults” or of any of Comerica’s “rights and remedies,” nor a commitment to forbearance. Masters defaulted by failing to pay the loan by the due date, and Comerica notified Masters that it would not renew the loan, advising Masters to seek alternative financing. Comerica did, however, offer to extend the due date of the loan until November to give Masters time to obtain new financing, and advanced another $500,000to Masters, over another written provision, agreed to by Masters, that these actions did not waive any of Comerica’s rights and remedies under the initial loan agreement.
¶121 The economy slowed, reducing the values of the securities provided by Masters’ guarantors, and placing Masters in default under the loan agreement for that reason. Further, they failed to obtain new financing and defaulted on the extended November due date. Comerica advised Masters in writing on November 25 that it was forbearing only day to day, and that if the loan was not paid in full by December 5, 2008, it would exercise its remedies — explaining again that its failure to act immediately was not a waiver or modification of its right to do so. Then, Comerica went further, explaining that it anticipated that future discussions about Masters’ debt would be undertaken, but if so, Comerica would not be bound unless an agreement was “reached on all *39 issues,” the agreement was reduced to writing, and signed by Masters, Masters’ guarantors, and Comerica.
¶122 Here, Comerica was not only advising that it was preserving its rights, but also taking the extra precaution — prescient, as it turned out — of protecting itself against claims of waiver for engaging Masters further about Masters’ debt, making it clear that it would not be bound unless any understanding was reduced to writing and signed by all parties, including by Masters’ guarantors. Comerica took care to ensure that the rules for future discussions, as well as the status of the matter, were made very clear. As a sophisticated borrower, Masters knew all of this full well. In an internal email dated November 20, Masters’ Brian McNamara advised:
|T]he time of reckoning is drawing very close... . We must communicate (IN PERSON) in certain and unequivocal terms to our investors/lenders that their guarantees will most likely be called and converted to cash by Comerica after month end.... We owe it to them to insure that they understand the situation completely and will not be surprised if Comerica pulls the trigger.
Further, Masters’ Cashflow Report of November 24 confirmed that “Masters is not able to cover interest and payroll, among other commitments, due over the next few days which will also trigger a default to Comerica. If the default is executed, guarantors’ assets will be seized and Masters accounts in the US will be frozen, which will effectively close the US business.”
¶123 The Court’s supposition that Comerica’s conduct throughout this financial transaction suggests an intention by Comerica to “lull” Masters into a belief that strict compliance would not be required is, in my view, starkly antagonistic to the record, as will be further noted herein. Opinion, ¶¶ 81-82. The rules governing the parties’ relationship demonstrated from the beginning the necessity of compliance, including written and signed confirmation, and these requirements were well understood by all parties.
¶124 December 5th came without payment by Masters. In discussions with Masters, Comerica continued to forbear only day to day. Masters’ Gregory Yaklin was in contact with Comerica, and emailed internally as follows on December 5th:
Comerica has agreed to forbear today. They have also agreed to send us a term sheet specifying what items they need to see us achieve as well as the required timing to continue to forbear. If we can continue to comply with the forbearance terms, they will forbear through January 31.... Comerica is not saying they will blankly forbear until 1 / 31. It is just that Comerica has agreed to *40 define for us the terms on which they will continue to forbear because we have not really accomplished anything concrete at this point.
¶125 On December 17, Comerica delivered, as promised, a written offer setting forth the terms under which it would continue to forbear, known in this litigation as the Forbearance Agreement. Comerica reserved its rights and remedies and stated that it would not be bound until there was a written agreement on all issues. The Comerica conditions were, in summary, liquidation of sufficient of the guarantors’ securities to secure the loan and deposit of funds to pay interest and bank fees by December 29, and signatures by all parties, including Masters’ guarantors, by December 19. Comerica emphasized, as it had before, that “absent any express written waiver by Bank, Bank will not be bound by an agreement on any individual issues unless and until an agreement is reached ... reduced to writing and signed by Company and Guarantors and Bank.” As noted in the quote at the beginning of this dissent, Masters’ Yaklin then expressed that, although the time in which Masters was to accomplish these things was short, Comerica had given Masters an unexpectedly generous timeframe, stating “[t]here is certainly no more moving the Bank and I was quite surprised they gave us until 12/29.” Masters was not being lulled. Rather, they knew full well: “There is no more moving the Bank.”
¶126 Thereafter, Masters and its guarantors fulfilled some of the conditions, but not all, failing to complete several signature and financial requirements. Masters signed the Agreement by December 19 and returned it, whereupon a Comerica representative told Masters on December 22 that he was looking forward to the rest of the signatures. On December 24, Comerica’s counsel mailed a letter to guarantor Vlahos that he must execute the required security agreement by December 29. This was not done. On December 29, Masters’ Curtis Howell said in an internal email that Vlahos was “on a small island somewhere off the coast of Palm Beach” and would be delayed until after January 1st. On December 30, Yaklin internally emailed that Comerica “told me that the signed forbearance agreement was required to be received from Dr[.] Vlahos today or they would not forbear any longer. This is in addition to all the other being resolved by tomorrow.”
¶127 The facts specifically cited by the Court in drawing the suggestion that Comerica’s conduct was lulling Masters along, and in affirming the denial of summary judgment, largely focus on Comerica’s acceptance of signatures after December 19, and Comerica’s knowledge *41 that Vlahos was out of the country. Opinion, ¶¶ 85,89. But there was never any indication from Comerica that it would delay the requirements of the Forbearance Agreement until Vlahos finished his vacation, or that it was willing to allow further time to satisfy the remaining financial conditions. To the contrary, Comerica requested the signature on December 17, December 24, and December 30 (demanding it “today” or it would cease to forbear). In fact, on December 30, Comerica contacted Masters, reported the signature had not been received, and said “we need” the documents signed by Vlahos. The Court states that Comerica “gave no indication that Vlahos’s signature was an urgent matter,” Opinion, ¶ 87, but the evidence is to the contrary. Comerica made repeated requests for the signature until December 30, when Comerica stated that the signature was needed “today” or Comerica would cease forbearing. This was urgent.
¶128 Context here is important. These are sophisticated parties in a sophisticated transaction. Masters was already in default. Comerica was forbearing only day to day. Comerica could exercise its rights at any time and, as provided by carefully prepared documents, it would not waive that right except by express written agreement and upon completion of the conditions of forbearance. Most importantly, Masters knew all of this. They were Tinder no illusions. The Court cites work done by both sides toward completion of the Agreement, but in the end, multiple of Masters’ obligations were not satisfied. Partial performance of conditions under a legal framework that requires full performance does not constitute waiver of unsatisfied conditions. As explained by Williston on Contracts, “when the parties to a proposed contract have agreed that the contract is not to be effective or binding until certain conditions are performed or occur, no binding contract will arise until the conditions specified have occurred or been performed.” 13 Richard A. Lord, Williston on Contracts § 38:7,439 (4th ed. 2013). Our holding in A.T. Klemens & Son v. Reber Plumbing & Heating Co., 139 Mont. 115, 119, 360 P.2d 1005, 1007 (1961), is also apropos: “Where parties to a contract verbally agree upon all of its terms but stipulate that it will not be binding until it is reduced to writing, it is not binding upon the parties until it is reduced to writing and signed.”
¶129 There was no evidence Masters was lulled by Comerica — quite the opposite, Masters’ internal communications demonstrate they knew Comerica could act on its default any day. Comerica made repeated demands, but they were not fulfilled. Finally, on December 30, Comerica told Masters it could not forbear any longer, and swept the accounts the next day. In contrast to the “hard” evidence that documents Comerica’s action, Masters’ allegations of being misled are *42 “speculation, or conclusory statements” that are without basis in the record and insufficient to defeat summary judgment. Lorang, ¶ 39. There is no evidence here that Comerica “unequivocally” waived the conditions, gave an “express” written or oral statement of waiver and, I submit, conveyed by conduct that its “intention and purpose” was to waive the conditions. Paulson, ¶ 39.
¶130 This was further illustrated by what occurred after Comerica swept the accounts. Masters’ communications reflected its understanding that it had simply failed to satisfy the conditions. Masters’ Howell emailed Comerica on December 31, stating:
[T]he only remaining contingency is that our investors require waiting until early next week on the approval of the other $500,000 investor fusion by Letter of Credit before they commit the initial $350,000. We even have the funds to pay the majority of the outstanding interest... . All of the other funds and their availability should be resolved next week.
In short, even beyond the failure to obtain Vlahos’s signature, Masters still needed more time to make arrangements to meet the financial conditions, offering only that they had enough money to pay “the majority” of the outstanding interest, and that another week “should” resolve the problems with the other sums that were required. On January 3,2009, Howell emailed the Masters’ board of directors:
Comerica had wanted all paperwork signed and cash deposited in Masters [sic] account at the bank by Dec 29.... [T]his was not able to be completed by the 29th and we had communicated with Comerica that we were able to pay all interest due through 12/31.... We felt this would be acceptable but on the afternoon of Dec 30 they called us to say that they had decided this would not be acceptable and they were going to foreclose on the loan.
Clearly, everyone knew the score.
¶131 This was not a jury question. The cited evidence is of record and uncontested. While Masters undoubtedly preferred to have the jury decide the question of contract formation, “the existence of a contract is ordinarily a question of law,” and when there are no issues of material fact for a jury to resolve, the question is appropriately resolved by summary judgment. Sayler v. Mont. Dep’t of Labor & Indus., 2014 MT 255A, ¶ 17, 376 Mont. 369, 336 P.3d 358 (citing Chipman v. Nw. Healthcare Corp., 2014 MT 15, ¶ 12, 373 Mont. 360, 317 P.3d 182). Comerica is entitled to judgment as a matter of law. ¶132 The Court’s decision makes it practically difficult for commercial banks to work with a commercial borrower in a default position, such as Masters’, without running a high risk of subjecting *43 itself to a waiver argument. This is not the situation we analyzed in Morrow v. Bank of Am.., N.A., 2014 MT 117, 375 Mont. 38, 324 P.3d 1167, where there was evidence of repeated assurances of relief from the lender to the borrower. Rather, Comerica handled this transaction with formality, putting the terms in writing and stating clearly it was not waiving its rights. What remains is the question of what more Comerica should have done to ensure that, by attempting to work reasonably with Masters by making concessions, it could secure its position without subjecting itself to liability in the event Masters could not satisfy the conditions. As we have noted, “Mommercial stability requires that parties to a contract may rely upon its express terms without worrying that the law will allow the other party to change the terms of the agreement at a later date.” Baker v. Bailey, 240 Mont. 139, 143, 782 P.2d 1286, 1288 (1989). That is particularly true in a sophisticated transaction, where documentation of every aspect has been prepared and communicated. Therefore, I would reverse for entry of judgment in favor of Comerica.[1]
¶133 However, given the fact that there are not four votes for the position espoused by this dissent, I also join Issue 4 of Justice Baker’s opinion. Apart from the issue of contract formation, I agree that the admission of the TARP evidence was prejudicial trial error and therefore concur in reversing the judgment and remanding the matter for a new trial.
JUSTICE McKINNON joins in the concurring and dissenting Opinion of JUSTICE RICE.