No. 98-119

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 41

ROY W. STANLEY and CAROL A. STANLEY, individually

and ROY W. STANLEY, CAROL A. STANLEY, LIBBY

STANLEY, HOLLY STANLEY and CARRIE STANLEY

as the assignees of ROY STANLEY CHEVROLET COMPANY,

Plaintiffs and Respondents,

v.

ALLAN G. HOLMS, AGH, INC., a/k/a ALLAN G. HOLMS,

INC., a Washington corporation or any successor, entity or

assignees of the assets of HOLMS MOTORS, INC., and THE

ALLAN G. HOLMS TRUST, Roger Crist, Trustee,

Defendants and Appellants.

APPEAL FROM: District Court of the Eleventh Judicial District,

In and for the County of Flathead,

The Honorable Katherine R. Curtis, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Lee C. Henning; Henning & Keedy, Kalispell, Montana

Frank B. Morrison; Morrisons, McCarthy & Baraban, Whitefish,

Montana

For Respondents:

Gary R. Christiansen; Warden, Christiansen, Johnson & Berg,

Kalispell, Montana

Submitted on Briefs: February 24, 1999

No

Decided: March 12, 1999

Filed:

_____

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

**¶1. This is an appeal from the Eleventh Judicial District Court, Flathead County. The District Court granted the plaintiffs' second motion for summary judgment, and denied the defendants' motion to amend the judgment. The defendants appeal. We affirm.**

**¶2. We address the following dispositive issues:**

**¶3. 1. Did the District Court abuse its discretion when it ruled on the motion for summary judgment without allowing Holms the opportunity to conduct further discovery?**

**¶4. 2. Did the District Court err by failing to consider the second affidavit of Allan Holms when deciding the motion for summary judgment?**

**¶5. 3. Do genuine issues of material fact exist concerning fraud and economic duress which precluded summary judgment on Holms' counterclaims?**

## FACTUAL AND PROCEDURAL BACKGROUND

**¶6. The following facts are taken primarily from the two affidavits of Allan Holms filed in opposition to the plaintiffs' motion for summary judgment. In 1992, Allan G. Holms and affiliated entities (collectively, Holms) purchased an automobile dealership located in Kalispell, Montana, from Roy W. Stanley, Carol A. Stanley and other assignees of the Roy Stanley Chevrolet Company (collectively, the Stanleys).**

The purchase agreement contained a provision giving Holms the option to purchase the real property on which the dealership was located. In 1994, Holms and the Stanleys entered into negotiations to sell the dealership to a third party because Holms was developing another dealership in Spokane, Washington, and needed cash from the sale of the Kalispell dealership to fund it.

¶7. Holms received two offers from third parties to purchase the Kalispell dealership. Pursuant to the first offer, Holms would exercise the option in the 1992 agreement to purchase the real property underlying the dealership for $1.5 million which by 1994 appraised for $2.45 million. The terms of the first offer allowed Holms to pay the Stanleys monies owed under the 1992 agreement. Holms received a second offer from an entity known as the Corwin-Eisinger group. Under the second offer, the Stanleys would retain ownership of the land, but the purchasers would lease it for 10 years for an ultimate payment of $1.7 million. This second offer would provide tax advantages to the Stanleys and the capital needed by Holms to invest in the Spokane dealership. The Stanleys decided that Holms should sell the dealership to the Corwin-Eisinger group.

¶8. On September 19, 1994, Holms sent the Stanleys a letter and memorandum, outlining the terms of the proposed agreement with the Corwin-Eisinger group; Holms and the Corwin-Eisinger group entered into an Asset Sale Agreement according to the terms and conditions allegedly agreed to by the Stanleys on September 23, 1994. The closing date for the sale was set for November 1, 1994.

¶9. Later in the day on September 23, 1994, Holms received a letter from the Stanleys purporting to clarify the status of Holms' proposal to sell the dealership. In Holms' view, however, the letter contained significant differences from the prior agreement, which already had been incorporated into the Asset Sale Agreement. After receiving the letter, Holms contacted the first prospective purchaser, who renewed his earlier offer. The Stanleys, however, informed Holms that the dealership could not be sold under the terms of the first offer, because Holms had defaulted on the 1992 purchase agreement and, as a result, no longer had the option to purchase the underlying real property.

¶10. In the meantime, the Stanleys sent the Corwin-Eisinger group a letter dated September 29, 1994, which purported to outline an agreement between the Stanleys and the Corwin-Eisinger group. The letter states that it is "a letter of intent, not a

legal contract, [and] is subject to the approval of all parties, attorneys, General Motors, GMAC, etc." Holms claims that this letter <u>confirmed</u> the terms of the Asset Sale Agreement, even though the Stanleys had informed Holms that they were no longer agreeing to the terms which had been incorporated into that agreement. Holms also claims that over the next 60 days, the Stanleys took inconsistent positions between Holms and the Corwin-Eisinger group, in an effort to negotiate more favorable terms on their own behalf.

¶11. Holms further asserts that, during this time frame, the Stanleys disrupted Holms' business. For example, Allan Holms' second affidavit states that the Stanleys publicly disclosed the fact that Holms was in the process of selling the dealership. They also sent Holms a notice claiming Holms had defaulted on the 1992 purchase agreement, and sent copies of the default notice to Holms' financing sources and various automobile manufacturers. Holms testified that this disruption caused financial loss and resulted in the near cessation of the Kalispell business.

¶12. Eventually, Holms and the Corwin-Eisinger group entered into a final closing agreement dated November 30, 1994. The Stanleys and other entities such as Like-Nu corporation, to whom Holms owed certain monies, also signed the agreement. Holms alleges that the terms of that agreement differed materially from the agreement entered into with the Stanleys in September of 1994. In particular, the final agreement included a release waiving "all claims for all damages arising out of acts, representations, or matters known or unknown each may have against the other . . . ," except for claims against Holms for monies owed relating to the 1992 purchase of the Kalispell dealership. Holms testified by affidavit that the Stanleys presented the final agreement containing the release on a take it or leave it basis. Holms also testified to a shortfall in operating cash exceeding half a million dollars that would have been obtained had the Stanleys fulfilled their September of 1994 agreement. Ultimately, Holms was not able to make the Spokane dealership a success.

¶13. On August 25, 1995, the Stanleys filed a complaint and, on September 18, 1995, they filed an amended complaint against Holms to recover monies due pursuant to various contractual agreements, guarantees, and promissory notes relating to the 1992 purchase of the Kalispell dealership. On December 1, 1995, three days prior to the deadline for answers to the Stanleys' first discovery requests, Holms' counsel filed a motion to withdraw. Neither Holms nor counsel filed a response to the discovery requests. On December 8, 1995, the Stanleys filed a motion for summary

judgment based primarily on matters deemed admitted by Holms' failure to respond to the request for admissions.

¶14. Holms' present counsel undertook to represent Holms on January 9, 1996, and, on January 10, 1996, Holms filed various motions, including a motion to amend to assert counterclaims against the Stanleys. Holms sought to bring claims for breach of the implied covenant of good faith and fair dealing, breach of contract, and fraud. Holms essentially claimed that the Stanleys had entered into an agreement in September of 1994, but subsequently reneged on that agreement, causing harm. On January 23, 1996, Holms also served objections and answers to the Stanleys' first discovery requests. The District Court granted the Stanleys' motion for summary judgment on April 26, 1996.

¶15. On appeal, this Court reversed and remanded. We directed the District Court to rule on Holms' motion to amend the pleadings pursuant to the criteria set forth in Rule 15(a), M.R.Civ.P., and to consider the Stanleys' motion for summary judgment in light of any amended pleadings the court permitted to be filed, Holms' discovery responses, and the state of the record at the time the motion for summary judgment was heard. See Stanley v. Holms (1997), 281 Mont. 329, 340, 934 P.2d 196, 203.

¶16. Following remand, the Stanleys filed a reply to Holms' counterclaims on April 24, 1997, alleging as an affirmative defense that Holms had executed a release waiving all claims against them. The Stanleys also filed a second motion for summary judgment on both the amended complaint and the counterclaims. On October 27, 1997, the District Court entered an order granting Holms' motion to amend the pleadings to assert counterclaims against the Stanleys. The court also granted the Stanleys' motion for summary judgment on both the amended complaint and on the counterclaims. The District Court entered judgment in favor of the Stanleys on October 30, 1997, and on December 30, 1997, denied Holms' motion to amend the judgment. This appeal followed.

## ISSUE ONE

¶17. Did the District Court abuse its discretion when it ruled on the motion for summary judgment without allowing Holms the opportunity to conduct further discovery?

¶18. Holms contends that the motion for summary judgment was premature because of an inadequate opportunity to conduct discovery. Specifically, the arguments are: 1) there were fewer than 45 days during which the case was not subject to either an appeal or a dispositive summary judgment motion in which to conduct discovery; 2) because the District Court simultaneously granted Holms' motion to file the counterclaims and granted summary judgment on those counterclaims, no adequate opportunity was allowed to conduct discovery on those claims; and 3) the summary judgment was premature because the court granted the motion in spite of the Stanleys' refusal to fully answer requests for production of documents. In the latter regard, Holms notes that there was a pending motion to compel the Stanleys to produce documents, after which deposition of various individuals were planned.

¶19. District courts have inherent discretionary power to control discovery. J.L. v. Kienenberger (1993), 257 Mont. 113, 119, 848 P.2d 472, 476 (citation omitted). This discretionary power extends to deciding whether to deny or to continue a motion for summary judgment pursuant to Rule 56(f), M.R.Civ.P., on the basis that the party opposing the motion needs further discovery. Kienenberger, 257 Mont. at 120, 848 P.2d at 477; Howell v. Glacier General Assur. Co. (1989), 240 Mont. 383, 386, 785 P.2d 1018, 1019, 1020. In urging the court to deny the motion for summary judgment on the basis that it was premature, Holms' argument was based on the standards set forth in Rule 56(f), M.R.Civ.P., which provides as follows:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

This Court has stated that a district court does not abuse its discretion in denying a Rule 56(f), M.R.Civ.P., motion where the party opposing a motion for summary judgment does not establish how the proposed discovery could preclude summary judgment. Kienenberger, 257 Mont. at 120, 848 P.2d at 477; Howell, 240 Mont. at 386, 785 P.2d at 1019, 1020.

¶20. Although Holms has detailed the sequence of events in this case and vigorously argues that more time was needed to obtain documents and take depositions, neither

Holms' briefs nor the supporting affidavits in the District Court establish how the proposed discovery could preclude summary judgment. The only evidence Holms hoped to obtain was a letter written by the Stanleys to the Corwin-Eisinger group in September of 1994. However, a copy of that letter was obtained through other means and attached to Holms' affidavit in opposition to the Stanleys' motion for summary judgment. Thus, the District Court reviewed the letter in deciding the motion. Furthermore, Allan Holms testified in two affidavits that the Stanleys had reneged on commitments they made in September of 1994. Holms fails to explain what new facts could have been obtained through further discovery which could defeat the Stanleys' motion.

¶21. We hold that the District Court did not abuse its discretion in conducting the summary judgment hearing and ruling on the Stanleys' motion without allowing Holms the opportunity to conduct further discovery.

ISSUE TWO

¶22. Did the District Court err by failing to consider the second affidavit of Allan Holms when deciding the motion for summary judgment?

¶23. When the Stanleys filed their second motion for summary judgment after remand from this Court, Allan Holms prepared a second affidavit in opposition to the motion. Holms contends that the District Court failed to consider this affidavit and that it erred in failing to do so. In support of the contention that the court failed to consider the second affidavit, Holms points to the following portion of the District Court's order:

Concerning the fraud allegation, Plaintiffs have shown, through supporting affidavits and the release and accompanying documentation, the absence of any genuine issue of material fact that the release bars the counterclaim. Defendants' responsive affidavit, filed in connection with the initial motion for summary judgment (the only substantive affidavit submitted in connection with Defendants' opposition to the renewed motion was a facsimile of an Allan Holms affidavit, which was not followed by the original within five (5) business days, or ever, as required by Rule 5, M.R.Civ.P., so it cannot be considered), sets forth no more than vague, conclusory allegations concerning the fraud.

¶24. It appears, however, that the District Court did review and consider Allan Holms' second affidavit. At the hearing on the summary judgment motion, the court stated: "I have read your briefs; I have read your affidavits, Mr. Henning. I even read the affidavits I got yesterday afternoon and the exhibits." Furthermore, in its order denying Holms' post-summary judgment motion to amend the judgment, the District Court clarified that it had considered the second affidavit:

The Court file does not reflect the original affidavit having been filed until November. Nonetheless, the Court's Order on the Motion for Summary Judgment makes it clear that the faxed affidavit of Alan G. Holms _was_ reviewed and considered, and that the Court found it to be vague and conclusory, while failing to raise any genuine issues of material fact.

¶25. On this record, we reject Holms' contention that the District Court failed to evaluate the second affidavit, and therefore we need not address Holms' additional arguments as to why justice demanded its consideration. We hold that the District Court did not fail to consider the second affidavit of Allan Holms and, as a result, that Holms has not established any error in this regard.

## ISSUE THREE

¶26. Do genuine issues of material fact exist concerning fraud and economic duress which precluded summary judgment on Holms' counterclaims?

¶27. Holms does not contest the allegations in the Stanleys' amended complaint that certain monies were owed pursuant to the 1992 agreement to purchase the Kalispell dealership. In fact, Holms admitted--in discovery responses and at the summary judgment hearing--having defaulted on various agreements, guarantees and promissory notes by failing to make certain payments. Accordingly, summary judgment on the Stanleys' amended complaint was appropriate.

¶28. Holms' only substantive "defense" involves the Stanleys allegedly acting in bad faith and failing to fulfill a commitment made in September of 1994 when the parties negotiated to sell the Kalispell dealership to a third party. These alleged actions by the Stanleys form the basis for Holms' counterclaims for breach of the implied

covenant of good faith and fair dealing, and for fraud and to provide a set off to the Stanleys' claims.

¶29. The Stanleys, in turn, point to the release signed by Holms in the final closing agreement in November of 1994, wherein both parties waived "all claims" each had against the other except for the debts owed by Holms relating to the 1992 purchase of the Kalispell dealership. The Stanleys contend that the release is clear and unambiguous and, as a result, that they were entitled to summary judgment on Holms' counterclaims.

¶30. Holms does not dispute that the release of "all claims" purports to release the counterclaims against the Stanleys. Instead, Holms contends that the release was obtained through fraud and economic duress and is, therefore, unenforceable. From this premise, Holms reasons that the counterclaims for breach of the implied covenant of good faith and fair dealing and fraud must be submitted to a jury. Thus, the issue is whether Holms has raised genuine issues of material fact in support of the argument that the release is unenforceable.

¶31. We review a district court's order granting summary judgment *de novo*, using the same Rule 56, M.R.Civ.P., criteria as the district court. Stanley, 281 Mont. at 332-33, 934 P.2d at 198-99.

The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. We review the legal determinations made by a district court as to whether the court erred.

Bruner v. Yellowstone County (1995), 272 Mont. 261, 264-65, 900 P.2d 901, 903 (citations omitted).

¶32. Conclusory statements are insufficient to create genuine issues of material fact. Sprunk v. First Bank System (Sprunk II) (1992), 252 Mont. 463, 466-67, 830 P.2d 103, 105. The party opposing a summary judgment motion must, therefore, "set forth specific facts and cannot rely on speculative, fanciful, or conclusory

statements." Sprunk II, 252 Mont. at 466, 830 P.2d at 105 (citation omitted). Moreover, disagreement over the interpretation of facts does not amount to a genuine issue of material fact. Sprunk II, 252 Mont. at 466, 830 P.2d at 105. In the present case, we conclude that Holms has failed to set forth specific facts showing the existence of a genuine factual issue that the release is unenforceable due to fraud or economic duress.

¶33. It is well settled that a release may be set aside if it was obtained fraudulently. Sprunk v. First Bank Western M. Missoula (Sprunk I) (1987), 228 Mont. 168, 173, 741 P.2d 766, 769 (citation omitted). A mere suspicion of fraud is insufficient. Sprunk I, 228 Mont. at 173, 741 P.2d at 769. To survive a motion for summary judgment, a party alleging fraud must establish a prima facie case by providing evidence of the following elements:

1. a representation;

2. its falsity;

3. its materiality;

4. the speaker's knowledge of its falsity or ignorance of its truth;

5. the speaker's intent that it should be acted upon by the person and in the manner reasonably contemplated;

6. the hearer's ignorance of its falsity;

7. the hearer's reliance upon its truth;

8. the right of the hearer to rely upon it;

9. the hearer's consequent and proximate injury or damage.


Sprunk I, 228 Mont. at 174, 741 P.2d at 769 (citation omitted).

¶34. Even after drawing all reasonable inferences in favor of Holms as the party

opposing the motion for summary judgment, we conclude that Holms has not raised a genuine issue of material fact regarding fraud. While Holms' affidavits present conclusory allegations that the Stanleys backed out of commitments they made in September 1994, they do not set forth specific facts establishing the elements of fraud. Specifically, Holms failed to set forth any specific false representations made by the Stanleys, specific facts relating to the materiality of any such representations, and facts indicating that the Stanleys intended Holms to rely on such representations. On the other hand, the Stanleys have shown that the release is clear and unambiguous, thereby establishing the absence of any genuine issue of material fact that the release bars the counterclaims.

¶35. Holms also claims that the release was signed under economic duress. A party claiming economic duress must show that the release was signed under circumstances "evincing a lack of free will on the part of the contracting parties." Hoven v. First Bank (N.A.)-Billings (1990), 244 Mont. 229, 235, 797 P.2d 915, 919 (citing Aldrich & Co. v. Donovan (1989), 238 Mont. 431, 437, 778 P.2d 397, 401). "It is not sufficient to show that consent was secured by the pressure of financial circumstances. . . ." Hoven, 244 Mont. at 235, 797 P.2d at 919.

¶36. Here, Holms argues economic distress resulting from the Stanleys having reneged on a promise in the September of 1994 negotiations to sell the business to a third party and, instead, having continued to negotiate more favorable terms for themselves at Holms' expense. The Stanleys, on the other hand, admit that the parties made changes from the time the Asset Sale Agreement was negotiated between Holms and the Corwin-Eisinger group and the time the closing agreement was finally signed by those two parties, by them, and by other entities to whom Holms also owed money, such as Like-Nu corporation and Farmers and Merchants Bank. For example, the Stanleys note that, in the final closing agreement, they had to accept a promissory note from the buyers as a novation, rather than receive cash. Moreover, they contend that any changes in the agreement resulted from financial problems that Holms--rather than the Stanleys--created. Thus, the Stanleys insist that Holms bargained for the changes and, as part of the negotiation process, signed the release now alleged to be unenforceable; having accepted the benefits of the bargain, the Stanleys urge that Holms should not now be allowed to deprive the Stanleys of their part of the bargain. Finally, the Stanleys point out that Holms was represented by counsel during the drafting of the release, yet Holms presented no evidence via affidavits that the Stanleys exerted any undue pressure on Holms to sign the release.

¶37. Based on the record before it, the District Court concluded that any economic duress suffered by Holms was of Holms' own making. As partial security for the purchase of the Kalispell dealership in 1992, Holms had pledged two promissory notes from the Healthco Corporation as collateral. The District Court noted that Holms was under financial pressure because the Healthco Corporation had declared bankruptcy. Additionally, Holms needed capital for the Spokane dealership and it was solely Holms' idea to sell the Kalispell dealership to a third party. Thus, any economic pressure that led to--or was created by--those efforts was attributable to Holms and not the Stanleys. We agree with the District Court.

¶38. After reviewing Holms' affidavits and the transcript of the hearing on the motion for summary judgment, it appears clear that Holms suffered from economic pressure. However, proof that the release was secured by the pressure of financial circumstances is insufficient. Rather, to substantiate the allegation of economic duress, Holms was required to present facts indicating that the Stanleys produced Holms' financial distress and that Holms was the victim of a wrongful act which resulted in a deprivation of free will. Here, the record reflects that Holms suffered from economic pressure because of defaults in making certain payments due on the purchase of the Kalispell dealership, and because capital was needed for the Spokane dealership. Holms presented no evidence, however, that the Stanleys created these financial problems. To the contrary, it appears that Holms had total control over the Kalispell dealership for two years. Holms obviously hoped to pay off the debts to the Stanleys and to rescue the business opportunity in Spokane by selling the Kalispell dealership. While Holms is clearly disappointed at being ultimately unable to sell the Kalispell dealership under more favorable terms, no evidence was produced that the Stanleys caused any circumstances which deprived Holms of free will.

¶39. Holms cites various cases in support of the argument that the release was signed under economic duress, contending that Litten v. Jonathan Logan, Inc. (Pa. Super. Ct. 1971), 286 A.2d 913 is the most analogous to the present case. In Litten, the plaintiffs had entered into an oral agreement with the defendant to sell two corporations. In exchange for the stock of the corporations, the defendant agreed to pay the corporations' creditors, pay off the corporations' bank loans, pay plaintiffs any monies in excess of such payments from the assets of the corporations, employ the plaintiffs for a one-year term at a stipulated salary, and give one of the plaintiffs an option to purchase 5,000 shares of the stock during the one-year employment. Litten, 286 A.2d at 915-16. At the time the plaintiffs entered into the agreement, they

were not in drastic financial difficulties, but rather were solvent, had a solid net worth, and had many other business and financial options. <u>Litten</u>, 286 A.2d at 915. In reliance on the oral agreement, the plaintiffs transferred the stock of the two corporations to the defendant. The defendant, however, refused to carry out its oral promises. Not surprisingly, when the defendant refused to pay the plaintiffs' creditors and bank loans as promised, the creditors immediately threatened the plaintiffs with bankruptcy. Faced with immediate financial disaster, the plaintiffs signed a written agreement with the defendant which differed from the oral agreement in significant respects, such as the absence of a provision for return of excess monies from liquidation and of the one-year employment clause. Indeed, the plaintiffs who had begun working for the defendant were fired within two months. <u>Litten</u>, 286 A.2d at 916.

¶40. The plaintiffs in <u>Litten</u> filed a lawsuit against the defendant to recover money damages and an accounting on the basis of the oral contract. The defendant defended the action based on its contention that the later written contract, not the oral contract, governed the parties' rights and obligations. The plaintiffs countered that they were compelled to sign the written agreement under economic duress and coercion, because the defendant had maneuvered them into an untenable economic crisis. The case was submitted to a jury, which found for the plaintiffs. <u>Litten</u>, 286 A.2d at 914-15. Following the adverse jury verdict, the defendant filed a motion for a judgment notwithstanding the verdict or for a new trial. The trial court denied the motions. <u>Litten</u>, 286 A.2d at 914.

¶41. The defendant appealed, and the Superior Court of Pennsylvania concluded that ample evidence supported the jury's verdict that the plaintiffs executed the written agreement under economic duress created by the defendant. <u>Litten</u>, 286 A.2d at 915. According to the evidence, it was the defendant who had placed the plaintiffs in an "inextricable financial crisis" by breaching their oral agreement and, at that point, the plaintiffs' only recourse to avoid bankruptcy was to sign the written agreement. The <u>Litten</u> court concluded that this was precisely the kind of duress contemplated by the cases discussing the concept of "economic duress." <u>Litten</u>, 286 A.2d at 917.

¶42. The present case differs from <u>Litten</u> in significant respects. In <u>Litten</u>, the defendant's actions pushed the plaintiffs into dire financial circumstances. The plaintiffs were solvent and had many financial options prior to their oral agreement

with the defendant, but the defendant's wrongful actions in failing to honor the oral agreement forced the plaintiffs to the brink of bankruptcy leaving them with no alternative but to sign the written agreement. In the present case, the Stanleys neither contributed to nor caused Holms' financial crisis. Holms' financial difficulties existed independently of--and, indeed, predated--the sale of the Kalispell dealership. As discussed above, there is no evidence on the record before us that the Stanleys created Holms' financial difficulties in making the payments on the Kalispell dealership or Holms' need for additional capital for the Spokane dealership. As a result, <u>Litten</u> is readily distinguishable from the present case.

¶43. We conclude that Holms failed to present facts indicating that the Stanleys obtained the release through fraud or economic duress. We hold, therefore, that no genuine issues of material fact exist which precluded summary judgment on Holms' counterclaims.

¶44. Affirmed.

/S/ KARLA M. GRAY

We concur:


/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART


Justice William E. Hunt, Sr., concurring in part and dissenting in part.

¶45 I concur as to issues one and two of the majority opinion.

¶46 I dissent from issue three of the majority opinion which holds that there were no genuine issues of material fact concerning fraud and economic duress which precluded summary judgment on Holms' counterclaims. Instead, I would hold that the issue as to whether the release was obtained through fraud and economic duress is a factual question

that should have been decided by the jury.

¶47 Holms has set forth specific facts establishing that in September of 1994, the Stanleys entered into a binding agreement with them, allowing them to sell the dealership to a third party. He also set forth specific facts establishing that in reliance upon that agreement, Holms entered into a contract to sell the dealership to the Corwin-Eisinger group. Finally, Holms sets forth specific facts establishing that had the Stanleys honored their initial contract, Holms would have been able to make all his payments on the Kalispell dealership and also obtain the necessary capital to successfully operate the Spokane dealership.

¶48 Holms was entitled to rely upon the Stanleys' initial agreement. I would hold that there is a genuine factual issue as to whether the Stanleys' failure to honor the terms of that initial agreement constituted fraud and as to whether it was that failure that also caused Holms his financial duress. That is a question that should have been decided by a trier of fact.

¶49 For the foregoing reasons, I would reverse the District Court and hold that there were genuine issues of material fact which precluded summary judgment.

¶50 I concur in part and dissent in part.


/S/ WILLIAM E. HUNT, SR.