Justice Dirk Sandefur delivered the Opinion of the Court.
***3 ¶1 Woodrow and Christine Barstad (Sellers) appeal from the judgment of the Montana Third Judicial District Court, Powell County, granting summary judgment specifically enforcing post-auction real property buy-sell agreements between Sellers and respective auction purchasers, Glenn Davidson and Tom Ide (Buyers). We affirm.
*642 ¶2 We find the following restated issues dispositive on appeal:
1. Whether the District Court erroneously granted summary judgment specifically enforcing the parties' real estate buy-sell agreements despite genuine issues of material fact regarding conditions precedent to formation of the contracts?
2. Whether the District Court abused its discretion in not granting Sellers Rule 56(f) relief prior to rendering summary judgment?
FACTUAL AND PROCEDURAL BACKGROUND
¶3 Sellers are residents of Tasmania, Australia, who owned a 320-acre ranch property near Ovando in Powell County, Montana.[1] By written agreement dated April 2, 2016, Sellers contracted with an Alabama auction company, Albert Burney, Inc . (Auctioneer) to sell their ranch property at an "absolute auction with no minimums or reserves ... to the highest bidder(s) regardless of the bid price." In the listing agency agreement, Sellers "appointed" the Auctioneer as their "sole and exclusive agent" with the "exclusive right to sell" the property with their "written approval." Inter alia , the agency agreement specified that, upon sale, Sellers would convey the property by general warranty deed free and clear of all encumbrances, including but not limited to a then-outstanding mortgage debt in the amount of $ 550,000. The agreement specified that the auction would take place on the property on June 30, 2016.
¶4 At all times pertinent, the Auctioneer acted by and through James Morgan, its employed project manager. Following execution of the agency agreement with the Auctioneer, Sellers acted through Woodrow Barstad personally and under Christine Barstad's power of attorney.
¶5 The Auctioneer marketed the ranch to the public via a published brochure and website. The brochure and website indicated that the ***4 Sellers would auction the ranch property either as a whole or in two separate 160-acre parcels (Parcels #1 and #2). On the day of the auction, the Auctioneer distributed a conforming property sheet noting that Parcel #1 (southern parcel) included certain existing improvements (modular home, 60' x 84' barn, and a 100' x 260' arena) and that Parcel #2 (northern parcel) was unimproved. The auction day property sheet also referenced a required preliminary bid deposit-$ 50,000 to bid on the whole, $ 30,000 to bid on Parcel #1, or $ 20,000 to bid on Parcel #2.
¶6 The Auctioneer also prepared and published a two-page document, entitled Real Estate Auction Terms and Conditions (REATC), specifying the various terms and conditions of the auction and the subsequent real estate sales transaction(s). The introductory section of the REATC declared that, by bidding, all registered bidders agreed "to abide by [its] terms and conditions" which would "be attached to and become a part of" a subsequent written buy-sell agreement "represent[ing] the final contracted terms of the sale." The "Registration" section of the REATC specified that all bidders "must register and obtain a bid number." As a condition of registration, the REATC stated that, "[i]n order to bid, Bidders will be required to present a bid deposit in certified funds, or other funds acceptable to the Seller and/or Auction Company "-$ 50,000 to bid on the whole, $ 30,000 to bid on Parcel #1, or $ 20,000 to bid on Parcel #2. (Emphasis added.) The REATC made no reference to a registration form or other documentation required for registration or bidding.
¶7 The "Terms of Sale" section of the REATC specified that the successful auction bidder(s) would "be required to execute" a written buy-sell agreement "immediately following the [a]uction" with "an Earnest Money Deposit equal to ten percent (10%) of the total purchase price with the Bid Deposit being in cash, certified funds, or other funds acceptable to the Seller and the balance of the 10% being by company or personal check." The "Defaults" section of the REATC specified that, if Sellers default under *643 the post-auction buy-sell agreement, "Buyer shall have only the right of specific performance."
¶8 The Auctioneer and Woodrow Barstad were personally present on the property at the place and time of the auction. Prior to the auction, the Auctioneer administered the pre-auction registration of bidders in occasional consultation with Woodrow. Davidson appeared and sought to register with a $ 50,000 bid deposit in the form of a personal check and a letter from an Ohio bank (FirstMerit Bank) stating that he "has $ 50,000 available in his FirstMerit Bank accounts." The letter further stated that the undersigned Bank Branch Manager would be available ***5 for questions at a specified number. Finding the personal check and bank verification letter sufficient based on his experience and, as later-asserted, belief that Woodrow had personally authorized several other bidders to register "without required documentation," the Auctioneer accepted Davidson's bid deposit and issued him a bid number with an accompanying auction registration form.[2]
¶9 Tom Ide separately appeared and sought to register to bid at the auction. By subsequent affidavit, the Auctioneer attested that he allowed Ide to register and bid upon deposit of a $ 50,000 "cashier's check." In a later affidavit, the Auctioneer attested that Ide made his bid deposit in the form of $ 50,000 in cash.[3] The Auctioneer accepted Ide's bid deposit and issued him a bid number without an accompanying registration form.
¶10 At the auction, after determining that separate sales of Parcels #1 and #2 would yield the highest total sale price, the Auctioneer declared Davidson the highest and successful bidder on Parcel # 1 at $ 341,000. The Auctioneer declared Ide the highest and successful bidder on Parcel # 2 at $ 154,000.
¶11 Following the auction, Sellers, through Woodrow, immediately executed separate written buy-sell agreements with Davidson and Ide, respectively, using standard fill-in contract forms provided by the Auctioneer. Inter alia , the buy-sell agreements declared that the undersigned buyer was "the highest bona fide bidder" on each of the generally described parcels at an auction conducted on behalf of Sellers by the Auctioneer. The agreements stated that "Seller agrees to sell and convey [the property] to Purchaser by General Warranty Deed ... pursuant to" terms set forth in the agreement, including the incorporated and attached REATC as initialed by Woodrow. The ***6 agreements further stated that the "Seller acknowledges and agrees" that the Auctioneer conducted the auction "pursuant to a separate Agreement between Seller and Auction Company" and that the Seller "accepts Purchaser was the successful bidder ." (Emphasis added.) The agreements thus stated that, "[u]pon approval of this [a]greement ... by their signatures hereto, a valid and binding contract of sale shall exist under the [following] terms and conditions" set forth herein. The Auctioneer was not a party to the post-auction buy-sell agreements.
¶12 The Davidson buy-sell agreement specified a $ 341,000 purchased price for Parcel # 1 with a required $ 34,100 "earnest money" payment "to be applied as partial payment of the purchase price" with the balance due at closing. The Ide buy-sell agreement specified a $ 154,000 purchase price for Parcel #2 with a required $ 15,400 "earnest money" payment "to be applied as partial payment of the purchase price" with the balance due at closing. The agreements *644 further stated that the "Purchaser has given to" the designated closing title company an earnest money "deposit to be credited against the payment of the purchase price and as a guaranty of specific performance of this contract." The "Defaults" section of the agreements provided that, "[i]f Seller defaults in the performance of this Agreement, Purchaser may reclaim the earnest money deposit or ... shall have only the right of specific performance." The agreements finally included the following integration clause and acknowledgements:
This is the entire agreement between the parties. It replaces and super[s]edes any and all oral agreements between the parties, as well as any prior writings.
...
This is a legal document and each party to the contract acknowledge by their execution hereof that they have fully reviewed the matter and are satisfied with its content and understand the terms and conditions set-forth herein.
¶13 Upon execution of his post-auction buy-sell agreement, Davidson gave the Auctioneer a personal earnest money check in the amount of $ 34,100. The Auctioneer "Fed-Exed" the check to the closing title company the next day. Following deposit by the title company, the funds were drawn from Davidson's account on July 6, 2016. In subsequent telephone and email communications with Davidson on July 7, Woodrow did not mention any concern, objection, or perceived problem or discrepancy with the conduct of the auction or the sufficiency of Davidson's pre-auction bid deposit or post-auction earnest money payment.
¶14 Upon Ide's similar post-auction execution of a buy-sell agreement ***7 with Sellers, the Auctioneer accepted a $ 15,400 cash earnest money payment from Ide. In a subsequent affidavit, the Auctioneer attested that:
[1] Mark Hogan and I counted the cash in front of Mr. Ide to ensure the correct amount.
...
[2] The title company, ... however, would not accept cash.
[3] I flew home on Friday, June 31st, and went to our bank, BBVA Compass, that day to get the cash converted to a cashier's check in the amount of $ 15,400.
[4] Immediately afterwards, I went to Office Max to make copies of all of the documents, and sent the agreements and cashier's check via Fed-Ex to the title company.
In a later affidavit, the Auctioneer similarly stated that he accepted a $ 15,400 cash earnest money payment from Ide "on the day of the Auction, which [he then] converted to a cashier[']s check and deposited with [the closing title company] the following day."
¶15 In July 2016, Sellers separately notified Buyers that Sellers would not perform and close on the real estate sales as previously agreed due to Buyers' alleged non-compliance with pre-auction bid deposit and post-auction earnest money requirements.[4] Sellers asserted that Davidson's buy-sell agreement was void and unenforceable because his pre-auction bid deposit was not in the form of certified or guaranteed funds as required by the REATC. Sellers asserted that Ide's buy-sell agreement was void and unenforceable because his pre-auction bid deposit was not in funds "acceptable to the Seller" as required by the REATC and because he did not timely deposit his earnest money payment with the closing title company on the date of execution of the agreement as referenced therein.
¶16 In August 2016, Davidson and Ide commenced separate lawsuits in the Montana Third Judicial District Court seeking specific enforcement of their respective buy-sell agreements against Sellers. After the District Court consolidated the actions, Sellers asserted in their answer, inter alia , that the Buyers did not make their respective pre-auction bid deposits with certified or other acceptable funds. Sellers further counterclaimed that the buy-sell agreements were void due to fraud, misrepresentation, and "unclean hands." Following hearing on May 16, 2017, on the parties' cross-motions for *645 summary ***8 judgment, the District Court denied Sellers' motion and granted summary judgment to Buyers. The court rejected Sellers' assertions that the buy-sell agreements were either void due to non-compliance with pre-auction bid deposit requirements or due to lack of sufficient property descriptions (including specification of access and water rights). By final judgments filed January 8, 2018, the District Court ordered Sellers to specifically perform under the respective buy-sell agreements and convey the subject parcels, with appurtenant water rights, to the respective Buyers. Sellers timely appeal.
STANDARD OF REVIEW
¶17 We review summary judgment rulings de novo for compliance with M. R. Civ. P. 56. Dick Anderson Constr., Inc. v. Monroe Prop. Co. , 2011 MT 138, ¶ 16, 361 Mont. 30, 255 P.3d 1257. Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3). Whether a genuine issue of material fact exists or whether a party is entitled to judgment as a matter of law are conclusions of law subject to de novo review for correctness. Ereth v. Cascade Cty. , 2003 MT 328, ¶ 11, 318 Mont. 355, 81 P.3d 463. We review a district court's ruling on discovery motions for an abuse of discretion. Brookins v. Mote , 2012 MT 283, ¶ 21, 367 Mont. 193, 292 P.3d 347.
DISCUSSION
¶18 1. Whether the District Court erroneously granted summary judgment specifically enforcing the parties' real estate buy-sell agreements despite genuine issues of material fact regarding conditions precedent to formation of the contracts?
¶19 Sellers assert that genuine issues of material fact remained on the Rule 56 factual record as to whether the Buyers respectively satisfied conditions precedent to formation of their respective buy-sell agreements with Sellers. Sellers assert that, as referenced in the REATC and related registration cards used by the Auctioneer, a pre-auction bid deposit in the form of a cashier's check, bank guaranty, or other form of payment approved in writing by the Sellers was a specific condition precedent to Buyers' bid eligibility and, in turn, formation of the resulting post-auction buy-sell agreements. As to Davidson, Sellers assert that a genuine issue of material fact remained as to whether his personal check and accompanying bank verification letter satisfied the condition precedent to his post-auction buy-sell agreement with Sellers. As to Ide, Sellers assert that a genuine issue of material fact remains ***9 as to whether his bid deposit satisfied a condition precedent to his post-auction buy-sell agreement based on a discrepancy in the Auctioneer's post-auction affidavits as to whether Ide made his pre-auction bid deposit in cash or by cashier's check. We disagree on both counts.
¶20 A contract condition is the subsequent occurrence of a specific uncertain act, event, or circumstance. See § 28-1-401, MCA ; Restatement (Second) of Contracts § 224 (1981). A condition precedent to contract formation is a specific condition, usually an extraneous event or circumstance or third-party act, the occurrence upon which the reciprocal promises constituting the contract consideration depend. See § 28-1-403, MCA ; Thompson v. Lithia Chrysler Jeep Dodge of Great Falls , 2008 MT 175, ¶¶ 22, 30, 343 Mont. 392, 185 P.3d 332 (approval of third-party financing in amount and rate agreed in retail sales contract); ERA Real Estate Home & Ranch Props. v. Big Horn Game Ranch, Inc. , 213 Mont. 47, 52, 692 P.2d 1218, 1220 (1984) (third-party shareholder approval of ranch sale and partial in-kind consideration as condition precedent to formation of real estate buy-sell agreement); Hein v. Fox , 126 Mont. 514, 518, 254 P.2d 1076, 1079 (1953) (lender financing approval as waived condition precedent to formation of water well drilling contract). In contrast, a condition precedent to a contract performance, duty, or right is a specific post-formation act or forbearance by a promisor , the occurrence upon which the reciprocal performance or forbearance of the other party depends. See §§ 28-1-403, -404, -406, MCA ; Thompson , ¶ 22 ; King Res., Inc. v. Oliver , 2002 MT 301, ¶ 26, 313 Mont. 17, 59 P.3d 1172 (reciprocal promises bind regardless of a party's subsequent refusal or inability to *646 perform); Miller v. Titeca , 192 Mont. 357, 364-65, 628 P.2d 670, 675 (1981) (reciprocal promises of value sufficient to constitute valid consideration). See also Scottsdale Ins. Co. v. Hall , 2003 MT 188, ¶¶ 29-31, 316 Mont. 460, 73 P.3d 819 (owner failure to provide agreed foundations due to house mover failure to obtain insurance resulted in mutual breaches of contract promises rather than material failure of condition precedent to owner's performance); Weyler v. Kaufman , 196 Mont. 132, 136, 638 P.2d 393, 396 (1981) (promised assistance with tool down payment as condition precedent to contractor's promised performance); United Campgrounds, U. S. A. v. Stevenson , 175 Mont. 17, 21-22, 571 P.2d 1161, 1163 (1977) (franchisor breach of implied promise to maintain trade name standards as a material failure of an implied condition precedent to reciprocal performance by franchisee).
¶21 The failure or non-satisfaction of a condition precedent to contract formation renders the contemplated contract non-existent as ***10 never formed and thus non-binding and unenforceable. Thompson , ¶ 22. In contrast, the failure or non-satisfaction of a condition precedent to performance generally effects or constitutes a breach of an enforceable contract promise subject to remedy as a material or non-material breach of the contract. Estate of Gleason v. Cent. United Life Ins. Co. , 2015 MT 140, ¶ 35, 379 Mont. 219, 350 P.3d 349 ; Sjoberg v. Kravik , 233 Mont. 33, 38, 759 P.2d 966, 969 (1988). Accord Beckenheimer's Inc. v. Alameda Assocs. Ltd. P'ship , 327 Md. 536, 611 A.2d 105, 114 (1992) ; Rohauer v. Little , 736 P.2d 403, 409 (Colo. 1987) ; Restatement (Second) of Contracts § 227(2) cmt. d (1981); 13 Richard A. Lord, Williston on Contracts § 38:13 (4th ed. 2013).
¶22 Upon a material breach of a contract, the non-breaching party has the option of either rescinding the contract without requirement for further performance or, alternatively, enforcing the contract at law or in equity. R.C. Hobbs Enters., LLC v. J.G.L. Distrib., Inc. , 2004 MT 396, ¶ 33, 325 Mont. 277, 104 P.3d 503 ; Norwood v. Serv. Distrib., Inc. , 2000 MT 4, ¶¶ 29-33, 297 Mont. 473, 994 P.2d 25 ; Reinke v. Biegel , 185 Mont. 31, 35-37, 604 P.2d 315, 317-18 (1979). Accord Brown v. Grimes , 192 Cal.App.4th 265, 120 Cal.Rptr.3d 893, 902-03 (2011). In contrast, a non-material breach does not relieve the non-breaching party from performance but merely entitles the party to enforce the contract at law or in equity. R.C. Hobbs , ¶ 33 ; Norwood, ¶¶ 29-32 ; Reinke , 185 Mont. at 35-37, 604 P.2d at 317-18 ; Brown , 120 Cal.Rptr.3d at 902-03. See also Restatement (Second) of Contracts § 229 (1981) (non-occurrence of a condition of performance does not forfeit reciprocal performance of other party unless material to the agreement).
¶23 A breach of contract is not material if the breaching party substantially performed all essential contract requirements. Rohauer , 736 P.2d at 409. In other words, a breach is not material if the non-breaching party has or will substantially receive "the expected benefit of the contract." Stan Clauson Assocs., Inc. v. Coleman Bros. Constr., LLC , 297 P.3d 1042, 1045 (Colo. App. 2013). Substantial performance occurs when the breaching party has performed all "major aspects of the contract but has deviated in insignificant particulars that do not detract from the benefit" expected by the non-breaching party had the breaching party "literal[ly] perform[ed]." Rohauer , 736 P.2d at 410. A " 'material breach' is a failure to do something that is so fundamental to a contract that the failure to perform ... defeats the essential purpose of the contract." 23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 2018). Accord Reinke , 185 Mont. at 36, 604 P.2d at 317 ; Rogers v. Relyea , 184 Mont. 1, 6-7, 601 P.2d 37, 40 (1979). Whether a breach is material or not is a matter of "objective reasonableness ***11 rather than" the non-breaching party's "purely subjective belief." 23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 2018). A party claiming a material breach must show the materiality of the breach. R.C. Hobbs , ¶ 33 ; Norwood , ¶ 33.
¶24 Here, unlike the contracts at issue in Thompson , ERA Real Estate , and Fox , neither the REATC, nor the subsequent real estate buy-sell agreements that incorporated it, expressly specified or manifestly *647 implied any extraneous or third-party occurrence as a threshold condition precedent to triggering the parties' mutual or reciprocal promises under the buy-sell agreements. While the REATC expressly specified that the bid deposits must be in the form of certified funds or other form acceptable to the Sellers, neither the language of the buy-sell agreements, nor that of the incorporated REATC, expressly conditioned the parties' mutual obligations under the buy-sell agreements upon strict compliance with the specified pre-auction bid deposit requirements. Thus, unlike in Thompson , Buyers' compliance with the specified pre-auction bid requirements was not a condition precedent to formation of the post-auction buy-sell agreements between Sellers and the respective Buyers.
¶25 As to the conditions precedent to Sellers' performance, Davidson's tendered personal check and bank verification letter were not certified funds as referenced in the REATC. However, pursuant to the prior written agreement between Sellers and the Auctioneer, as well as the language of the REATC, the Auctioneer was the actual and manifestly ostensible agent of the Sellers. Beyond that actual and ostensible agency, the "Registration" section of the REATC expressly authorized prospective bidders to make the required bid deposit either "in certified funds, or other funds acceptable to the Seller and/or Auction Company ...." (Emphasis added.) Consequently, as a matter of law on the face of the REATC, the buy-sell agreements that incorporated it, and the prior agency agreement between the Sellers and Auctioneer, the Auctioneer was actually and ostensibly authorized to accept pre-auction bid deposits in any form he deemed acceptable. Regardless of Sellers' after-the-fact affidavit dispute as to the Auctioneer's rationale, or what he said or didn't say to or in Woodrow's presence prior to the auction, it is beyond genuine material dispute on the Rule 56 record that the Auctioneer in fact accepted Davidson's tendered personal check, as accompanied by his bank verification letter, as an acceptable form of funds for the required bid deposit in accordance with the REATC. It is similarly beyond genuine material dispute that the Auctioneer issued Davidson a bid number authorizing him to bid at the auction as required by the REATC.
***12 ¶26 Sellers nonetheless assert that genuine issues of material fact remained based on their assertions that Woodrow would not have accepted Davidson's bid deposit had he known about it and that the auction registration form issued to Davidson required Woodrow's written approval of any non-certified deposit in any event. However, Woodrow's after-the-fact assertion that he would not have approved the form of Davidson's deposit is immaterial based on the clear and unequivocal language of the REATC "Registration" section, the Auctioneer's actual and ostensible agency, and the fact not subject to genuine dispute that the Auctioneer found the deposit acceptable regardless of rationale. As to the auction registration form issued to Davidson, not only did the REATC not specify the registration form as a bid deposit or bidding prerequisite, the auction form itself includes no language purporting to require the Sellers' written approval of a non-certified bid deposit already approved by the Auctioneer pursuant to the REATC. The registration form merely includes a signature line for the Seller, or the Seller's agent, to give written authorization of a non-certified deposit in lieu of oral authorization and acceptance. The lack of Sellers' written authorization on Davidson's registration form is thus insufficient to create a genuine issue of material fact as to whether he was an authorized bidder under the REATC and the subsequent buy-sell agreement that incorporated it.
¶27 Even if, as asserted by Sellers, we could reasonably construe the auction registration form to be an incorporated part of the REATC and buy-sell agreement and to then to require Sellers' written authorization regardless of Auctioneer approval, there is no non-speculative basis in the Rule 56 record indicating that the lack of such written authorization in fact deprived or was likely to deprive Sellers of their essential contract expectancy under the terms of the REATC and incorporated buy-sell agreements. Thus, the form of Davidson's pre-auction bid deposit, and his derivative post-auction earnest *648 money deposit, neither effected a failure of a condition precedent to formation of his buy-sell agreement with Sellers, nor failure of a condition precedent to their performance thereunder. We hold that the District Court did not erroneously grant summary judgment specifically enforcing the Davidson buy-sell agreement against Sellers.
¶28 As to Ide, Sellers assert that a genuine issue of material fact remained as to whether Ide was qualified under the REATC to bid at the auction based on a discrepancy in the Auctioneer's affidavits as to whether Ide made his pre-auction bid deposit (and derivative post-auction earnest money deposit) by cashier's check as originally ***13 asserted, or, as later asserted, by cash later converted to cashier's check by the Auctioneer for deposit with the title company. Aside from the fact that Ide's affidavit assertions do not necessarily differ in any materially sinister regard as alleged by Sellers, whether he made his $ 50,000 bid deposit in cash or by cashier's check is immaterial because it remains beyond genuine material dispute that: (1) a cashier's check constituted "certified funds" as referenced in the REATC; (2) cold, hard cash is not yet anything less than the substantial equivalent of a cashier's check; and (3) the Seller's agent (the Auctioneer) was in possession of Ide's bid deposit and derivative earnest money deposit at all times until deposited with the title company as contemplated by the buy-sell agreement. Thus, the form of Ide's pre-auction bid deposit, and derivative post-auction earnest money deposit, neither effected a failure of a condition precedent to formation of his buy-sell agreement with Sellers, nor a failure of a condition precedent to their performance thereunder. We hold that the District Court did not erroneously grant summary judgment specifically enforcing the Ide buy-sell agreement with Sellers.
¶29 2. Whether the District Court abused its discretion in not granting Sellers Rule 56(f) relief prior to rendering summary judgment?
¶30 Upon motion and affidavit showing that a non-moving party "cannot present facts essential to justify ... opposition" to summary judgment, the court may deny or postpone summary judgment to afford opportunity for additional discovery. M. R. Civ. P. 56(f). However, the moving party has the burden of making a non-speculative affidavit showing of particular facts or types of fact sought and how, if found, those facts will preclude adverse judgment. Bridgman v. Union Pac. R.R. Co ., 2013 MT 289, ¶ 31, 372 Mont. 124, 311 P.3d 416 ; Rosenthal v. Cty. of Madison , 2007 MT 277, ¶ 42, 339 Mont. 419, 170 P.3d 493 ; Envtl. Contractors, LLC v. Moon , 1999 MT 178, ¶¶ 19-21, 295 Mont. 268, 983 P.2d 390 ; Stanley v. Holms , 1999 MT 41, ¶¶ 19-20, 293 Mont. 343, 975 P.2d 1242.
¶31 Here, based on the discrepancy in the Auctioneer's affidavits as to whether Ide made his pre-auction bid deposit in cash or by cashier's check and his real-time failure to generate corroborating evidence of which actually occurred, Sellers assert that the Auctioneer's "willingness ... to change his story to benefit a bidder ... is, at best ... deeply troubling" and, "[a]t worst, ... clear evidence of collusion and bid-rigging" as expressly prohibited by the REATC. Sellers based this alleged bidder misconduct in part on the asserted fiduciary duty of the Auctioneer, "[a]s the seller's real estate agent, ... [to] forbid any collusion with bidders to allow" unqualified bidders to bid. Sellers thus ***14 assert that the "suspicious nature" of the Auctioneer's testimony "[a]t the very least" warrants deposition of "Witness" Hogan[5] and the subpoenaing of "Ide's banks and other sources for $ 50,000 in cash."
¶32 However, except for a passing reference to M. R. Civ. P. 56(f) and associated complaint about Ide's inadequate discovery in their Response to Ide's Cross-Motion for Summary Judgment , Sellers did not file any pertinent discovery motion until the day of oral argument on the parties' summary judgment motions. At that time, the literal last-minute motions were separate motions pursuant to M. R. Civ. P. 37(a) to compel answers *649 to previously propounded discovery requests. The motions did not reference M. R. Civ. P. 56(f) and were further not supported by affidavit showings as required by Rule 56(f). The Rule 37 motions focused on Sellers' continuing assertions that the Buyers were not qualified bidders under the REATC. The motions neither sought time to depose Mark Hogan, nor opportunity to issue third-party subpoenas, as now asserted. Whether in name or substance, Sellers did not seek Rule 56(f) relief from the District Court and thus waived any related issue on appeal. Even if not waived, Seller's plea on appeal for Rule 56(f) relief sketches out nothing more than a general fishing expedition, i.e., conclusory allegation, mere suspicion, and speculation regarding Buyers with a dash of conspiratorial breach of fiduciary duty by the Sellers' own agent sprinkled in. We hold that the District Court did not erroneously deny Sellers Rule 56(f) relief prior to rendering judgment on the parties' cross-motions for summary judgment.
CONCLUSION
¶33 We hold that the District Court did not erroneously grant summary judgment specifically enforcing the Buyers' respective real estate buy-sell agreements with Sellers. We further hold that the court did not erroneously deny Sellers Rule 56(f) relief prior to rendering summary judgment on the parties' cross-motions for summary judgment.
¶34 Affirmed.
We concur:
MIKE McGRATH, C.J.
JAMES JEREMIAH SHEA, J.
BETH BAKER, J.
INGRID GUSTAFSON, J.

The 2004 warranty deed under which Sellers acquired the property referenced them with an address in Seeley Lake, Montana.

In a subsequent affidavit, Woodrow did not deny the Auctioneer's assertion that Woodrow allowed several others to register "without required documentation," but flatly denied the Auctioneer's additional affidavit assertions that he specifically told Woodrow that Davidson did not register with certified funds and that the Auctioneer had stated to others in Woodrow's presence that "a personal check and a Bank Letter of Guaranty" would suffice.

The Auctioneer's later affidavit did not explain the discrepancy in his affidavits regarding the form of Ide's pre-auction bid deposit. However, both affidavits attested that he accepted Ide's post-auction earnest money in the form of $ 15,400 in cash. The later affidavit attested that Ide "promptly tendered" his 10% earnest money payment to the Auctioneer in "cash ... in that amount on the day of the [a]uction, which" the Auctioneer then "converted to a cashier[']s check and deposited with" the escrow title company "the following day."

Though not at issue or material on appeal, Sellers notified Buyers in separate July 12, 2016 letters that water rights were not included in their respective sales.

In his later affidavit, the Auctioneer attested that Mark Hogan witnessed or participated in the counting-out of Ide's cash deposit.